**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **V.** | ) | |
| | ) | |
| **NATIVIDAD ZAVALA-ZAVALA** | ) | **EP-17-CR-2664-PRM** |
| **BLANCA NIEVE VASQUEZ-HERNANDEZ** | ) | **EP-17-CR-2660-PRM** |
| **ELBA LUZ DOMINGUEZ-PORTILLO** | ) | **EP-17-CR-2661-PRM** |
| **JOSE FRANCIS YANES-MANCIA** | ) | **EP-17-CR-2663-PRM** |
| **MAYNOR ALONSO CLAUDINO-LOPEZ** | ) | **EP-17-CR-2662-PRM** |

### BRIEF IN SUPPORT OF APPEAL FROM A DECISION OF A UNITED STATES MAGISTRATE JUDGE

Elba Luz Dominguez-Portillo, Natividad Zavala-Zavala, Jose Francis Yanes-Mancia, Blanca Nieve Vasquez-Hernandez, and Maynor Alonso Claudino-Lopez (collectively referred as "Parents-Appellants") appeal from judgment of criminal conviction and sentence entered by United States Magistrate Judge Miguel A. Torres. Because the Parents-Appellants' constitutional rights were violated, their convictions and sentences should be vacated.

### REQUEST FOR ORAL ARGUMENT

The Parents-Appellants request oral argument. The Parents-Appellants contend that their constitutional rights have been violated because the government separated them from their minor children. Consideration of this argument will require careful attention to the law under the Due Process Clause. The Parents-Appellants believe that oral argument will assist the Court in its determination of this appeal.

1

### SUBJECT MATTER AND APPELLATE JURISDICTION

1.  **Subject Matter Jurisdiction in Magistrate Court.**  This case arose from the prosecution on an alleged misdemeanor offense against the laws of the United States.  The magistrate court had jurisdiction under 18 U.S.C. § 3401(a).

2.  **Jurisdiction in the District Court.**  This is a direct appeal from a final decision of United States Magistrate Judge Miguel A. Torres entering judgment of criminal conviction and sentence.  This Court has jurisdiction of this appeal under 18 U.S.C. § 3402, Rule of Criminal Procedure 58(g)(2), and the Federal Rules of Appellate Procedure.

Under Federal Rule of Appellate Procedure 4(b), a criminal defendant who wishes to appeal a district court judgment must file a notice of appeal in the district court within 14 days after the entry of the judgment or order appealed from, or a notice of appeal by the Government. In this case, the district court entered judgment on December 1, 2017, and the Parent-Appellants filed their notices of appeal on December 14, 2017.

## ISSUES PRESENTED FOR REVIEW

(1) Whether the government's mechanism of separating the Parents-Appellants from their minor children is a calculated measure that deprives the Parents-Appellants from obtaining a fair trial in violation of Due Process.

(2) Whether the government's mechanism of separating the Parents-Appellants from their minor children is a coercive calculated measure that violates the Parents-Appellants' right against self-incrimination.

(3) Whether the government's mechanism of separating the Parents-Appellants from their minor children is a punishment that violates Due Process and the Eighth Amendment.

(4) Whether the government's mechanism of separating the Parents-Appellants from their minor children is a coercive calculated measure that violates *Brady*[1] and Due Process.

(5) Whether the government's mechanism of separating the Parents-Appellants from their minor children to obtain the Parent-Appellants' *petty misdemeanor convictions* constitutes "outrageous government conduct."

---

[1] *Brady v. Maryland,* 373 U.S. 83 (1963).

## STATEMENT OF THE CASE

Parents-Appellants are <u>all</u> similarly situated. Parents-Appellants and their minor children (all native of Central America) entered the United States from Mexico crossing the Rio Grande. <u>See</u> Defendants' Motion to Dismiss (Dkt. No. 13), Transcript of Initial Appearance (Dkt. No. 14), and Bench Trial Stipulated Exhibit 1 (Dkt. No. 47- immigration forms I-213/I-831).[2]

Elba Luz Dominguez-Portillo and her minor daughter, Josselin Paola Luna-Dominguez, are from El Salvador and they entered on October 21, 2017 at approximately 8:55 p.m. <u>See</u> Bench Trial Stipulated Exhibit 1 (Dkt. No. 47- immigration forms I-213/I-831). Natividad Zavala-Zavala and her minor grandson are from Honduras and they entered on October 22, 2017 at approximately 9:50 p.m. <u>Id.</u> Jose Francis Yanes-Mancia and his minor son, Jose Samuel Yanes-Guerra, are from Honduras and they entered on October 22, 2017 at approximately 9:50 p.m. <u>Id.</u> Blanca Nieve Vasquez-Hernandez and her minor son, Luis Alberto Landaverde-Vasquez, are from El Salvador and they entered on October 23, 2017 at approximately 9:45 p.m. <u>Id.</u> Maynor Alonso Claudino-Lopez and his minor son, Henry David Claudino-Gonzalez, are from Honduras and they entered on October 23, 2017 at approximately 6:09 a.m. <u>Id.</u>

Border Patrol Agents encountered the Parents-Appellants and arrested them with their minor children. <u>Id.</u> Each I-213/I-831 immigration form (except for that of Claudino-Lopez) reflects that, at the time the Parents-Appellants encountered immigration agents, they **expressly** made a "credible fear claim" of persecution if returned to their respective Central American countries. <u>See</u> Bench Trial Stipulated Exhibit 1 (Dkt. No. 47- immigration forms I-213/I-831). <u>However</u>, shortly after the arrests, the Parents-Appellants were separated from their minor

---

[2]Because all five cases are consolidated for appeal purposes, and because all documents and arguments are the same in each case, the cites to the record are to the documents on Ms. Vasquez-Hernandez's magistrate judge docket (17-MJ-4499-MAT). This is done for purposes of clarity since identical documents may have different document numbers in each of the five magistrate judge dockets.

children.  Id.  The record indicates that the separation was approved by the government.  See Bench Trial Stipulated Exhibit 1 (Dkt. No. 47- immigration forms I-213/I-831 of Dominguez-Portillo and Vasquez-Hernandez.)   Each I-213/I-831 immigration form (except for that of Zavala-Zavala) **expressly** states that the Parents-Appellants were apprehended with either their son or daughter. See Bench Trial Stipulated Exhibit 1 (Dkt. No. 47- immigration forms I-213/I-831).  The Parents-Appellants were taken to the El Paso County Jail and charged with misdemeanor illegal entry under § 1325, and the whereabouts of the minor children remained unknown to the Parents-Appellants.

Prior to trial, the Parents-Appellants' moved to dismiss their § 1325 charges.  (Dkt. No. 13)  The Parents-Appellants argued that they should not be charged under § 1325 because they left their Central American countries with their minor children to escape violence and to seek protection in the United States.  Id.  They argued, among other things, that their rights were violated under the Due Process Clause, and their prosecution by the government constituted outrageous conduct.  Id.  Magistrate Judge Torres denied the Parents-Appellants' motion to dismiss.  (Dkt. No. 26.)

Before their bench trial commenced, the Parents-Appellants renewed their motion to dismiss but the magistrate judge again denied it.  See Transcript of Bench Trial at 2 (Dkt. No. 49) At the bench trial, during their case in chief, the Parents-Appellants argued that their missing children were key material witnesses, which deprived them of their right to a fair trial.  Id. at 8-9. They argued that information as to the whereabouts of these key material witnesses was not provided by the government in the discovery.  Id.  They stated that these witnesses, under the government's custody, were clearly exculpatory regarding their well-founded fear claims.  Id.

At the bench trial, the Parents-Appellants also made a Rule 29 motion at the end of the government's case in chief.  Id. at 7-8.  But, Magistrate Judge Torres denied it.  Id.  At the close of the Parents-Appellants' case, they renewed their Rule 29 motion but Magistrate Torres again denied it.  Id. at 9.

At the conclusion of the bench trial, Magistrate Torres found the Parents-Appellants guilty.  The magistrate judge immediately sentenced the Parents-Appellants to one-year probation.  Id. at 47.  The Parents-Appellants then filed a motion to reconsider before the magistrate judge, asking that he reconsider his judgment and sentence. (Dkt. No. 42)  The Parents-Appellants incorporated by reference all their arguments made in their motion to dismiss and at trial.  Id.  They also contended that their indefinite separation from their children as a result of their conviction due to their subsequent deportation was inhumane and prejudicial to their cases in violation of Due Process.  Id.  They contended that their conviction and sentence terminated their parental rights and that punishment was grossly disproportionate to a § 1325 misdemeanor conviction, contrary to universal human standards of decency in **any** civilized society which implicates the Eighth Amendment.  Id.  The motion to reconsider, however, was denied.

After the bench trial, the magistrate judge issued a written opinion regarding his early denial of the Parents-Appellants' motion to dismiss. (Dkt. No. 51)  The government then filed a motion to correct the magistrate's opinion asking him to re-write his opinion to state that the government did not know if the minors were the children of the Parents-Appellants. (Dkt. No. 53)  The Parents-Appellants filed a Response in opposition contending, among other things, waiver on the part of the government regarding the issue. (Dkt. No. 59)  And, last week, the Parents-Appellants filed a supplemental memorandum to their Response informing the court that four out

of the five Parents-Appellants had been deported to their Central American countries.  (Dkt. No. 65)

On appeal, the Parent-Appellants contend that their conviction and sentence violated their constitutional rights.

## SUMMARY OF THE ARGUMENTS

**The Parents-Appellants' separation from their minor children and prosecution for petty misdemeanors under § 1325 violated their constitutional rights.**

When immigration authorities encountered the Central American Parents-Appellants and their minor children after crossing the Rio Grande and entering the United States from Mexico, the Parents-Appellants did not have authorization to be in the United States.  However, they made a "credible fear claim" of persecution/torture.  Nevertheless, they were separated from their minor children, prosecuted and convicted for violating 8 U.S.C. § 1325.

**First,** the government's mechanism of separating the Parents-Appellants from their minor children is a calculated measure that deprives the Parents-Appellants from obtaining a fair trial in violation of Due Process.  **Second,** the government's mechanism of separating the Parents-Appellants from their minor children is a coercive calculated measure that violates the Parents-Appellants' right against self-incrimination.  **Third,** the government's mechanism of separating the Parents-Appellants from their minor children is a punishment that violates Due Process and the Eighth Amendment.  **Fourth,** the government's mechanism of separating the Parents-Appellants from their minor children is a coercive calculated measure that violates *Brady* and Due Process.  **Fifth,** the government's mechanism of separating the Parents-Appellants from their minor children to obtain the Parent-Appellants' *petty misdemeanor convictions* constitutes "outrageous government conduct."  Accordingly, the magistrate judge's judgment must be reversed.

## ARGUMENT AND AUTHORITIES

**The Parents-Appellants' separation from their minor children and prosecution for petty misdemeanors under § 1325 violated their constitutional rights.**

After separating the Parents-Appellants from their minor children, the Parent-Appellants were prosecuted and convicted for petty misdemeanors of illegal entry under 8 U.S.C. § 1325. However, the Parents-Appellants' constitutional rights were violated. Therefore, their convictions should be reversed.

### A.  Standard of Review.

The scope of an appeal from a magistrate judge's judgment of conviction is the same as in an appeal to the court of appeals from a judgment entered by a district judge. *See* Fed. R. Crim. P. 58(g)(2)(D). Accordingly, this Court reviews "de novo the denial of a Rule 29 motion for judgment of acquittal." *United States v. Floyd,* 343 F.3d 363, 370 (5th Cir. 2003). Likewise, the court "review[s] constitutional claims de novo." *United States v. Estrada,* 66 F.3d 733, 735 (5th Cir. 1995).

### 1. The government's mechanism of separating the Parents-Appellants from their minor children is a calculated measure that deprives the Parents-Appellants from obtaining a fair trial in violation of Due Process.

Shortly after their arrests, the Parents-Appellants were separated from their minor children. The government then unfairly and unjustly offered the Parents-Appellants plea agreements. In their motion to dismiss, the Parents-Appellants stated their plea agreements were not fair agreements in accordance with Due Process. (Dkt. No. 13) They explained to the magistrate judge:

> The parent-defendants do not know where in the country, in what facility or under what conditions these minor children are being held. These minor children range in age from 7 to 16 years. Needless to say, the experience of being separated from their minor children

over two weeks in a foreign country has been stressful and tarrying to these parent defendants.

Id. at 2.  They stated:

> [T]he [Parent-Appellants] are extremely worried about the safety and well-being of their minor children and want to put these § 1325 charges behind them as quickly as possible in the hopes that they will be reunited with their children as soon as possible.  Thus, these [Parent-Appellants] do not voluntarily enter a plea of guilty as required by the Due Process Clause.  They plea because they have **no** choice!  They have an unfounded hope that pleading guilty is their only avenue to reunite with their children.  What would any caring parent do under the circumstances?  Would he or she elect to plea in order to put this behind him or her as soon as possible in order to search for his or her minor child?  Or would he or she elect to go to trial and delay an opportunity to check on the welfare of his or her child?  These parents left their countries with their children for an obvious reason— they care for their children's welfare and safety.  Thus, going to trial is simply a legal fiction for these [Parent-Appellants].  The only choice for them is to enter a guilty plea and reunite with their minor children as soon as possible.  They have no other realistic alternative.

Id. at 10-11.  Therefore, the Parents-Appellants rejected the plea agreements explaining to the magistrate judge that the element of compulsion, i.e., the separation from their minor children, removed the **voluntariness** required for purposes of Due Process with respect to guilty pleas.  The Parents-Appellants could not have pled guilty simply because Due Process guarantees under the Fifth Amendment demand and require that a defendant's guilty plea be voluntary.  *Boykin v. Alabama,* 395 U.S. 238, 242 (1969).  "[P]lea negotiations should be based on full disclosure of requested evidence."  *United States v. Zaragoza,* 780 F.3d 971, 981 (9th Cir. 2015).  The Parents-Appellants were fearful due to the unknown whereabouts of their minor children.  (Dkt. No. 13)

The government, **unfairly and unjustly,** then stated that the Parents-Appellants could simply go to trial.  However, the choice of going to trial for the Parents-Appellants, as argued below, did not remove "the threat and fear the government applies by keeping the [Parents-Appellants] apart from their minor children [as] a coercive tactic."  See Transcript of Evidentiary Hearing/Motion to Dismiss at 8-9 (Dkt. No. 41)

Moreover, a vital hallmark of a full and fair hearing is the opportunity to present evidence and testimony on one's behalf. *United States v. Natel,* 812 F.2d 937, 943 (5th Cir. 1987). "The hearing, moreover, must be a real one, not a sham or a pretense." *Moore v. Dempsey,* 261 U.S. 86, 90-91 (1923).

At the bench trial and throughout all proceedings, the Parents-Appellants and Magistrate Judge Torres repeatedly stated that the major problem with these cases was the fact that the government held the minor children in unknown places and under unknown conditions. At the bench trial, the Parents-Appellants argued to Magistrate Judge Torres that the fact that these key material witnesses were missing constituted a violation of the Parents-Appellants' due process rights to a fair trial because they could not fairly assert a defense. <u>See</u> Transcript of Bench Trial/Sentencing at 8-9 (Dkt. No. 49)  The Parents-Appellants *specifically* stated:

> Judge, my clients left their countries each with a minor child or grandchild escaping horrible violence in their Central American countries.
> As we previously explained at the hearing in our motion to dismiss, key material witnesses, the children, are missing here.  The parties' stipulated exhibits support that claim. Information as to the whereabouts of these material witnesses was **not** provided anywhere in the discovery, and these witnesses under the Government's [custody] are exculpatory regarding the Defendants well founded fear for leaving their country and being forced to come here with no alternative to seek safety to avoid the harm.
> The fact that these children, the key material witnesses, are missing is a violation of due process rights for a fair trial and of their right against [] self incrimination.  It forces the defendants to take the stand in order to establish their defense and so there is prejudice. One constitutional right should not have be surrendered in order to assert another one.
> As we have proven at every stage, Judge, in this Court, the Government's conduct here is outrageous and in bad faith.

<u>Id.</u>  Essentially the Parents-Appellants stated that, because key material witnesses to their defense were missing, they could not assert a duress defense.  <u>Id.</u>  From the very beginning, the Parents-Appellants made a "credible fear claim" of persecution or torture.  The immigration officers even stamped their I-213/I-831 immigration forms with the words "credible fear claim."  <u>See</u> Bench Trial Stipulated Exhibit 1 (Dkt. No. 47- immigration forms I-213/I-831).  And, as stated above,

they told the judge they needed the material key witnesses, i.e., their minor children, to establish that defense.

Duress is "a common-law defense that allows a jury to find that the defendant's conduct is excused, even though the government has carried its burden of proof." *Dixon v. United States,* 548 U.S. 1, 12-14 & n.9 (2006).  The Fifth Circuit has stated that to establish a duress defense, defendant must show:

(1) That the defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;

(2) That the defendant had not recklessly or negligently placed herself in a situation in which it was probable that she would be forced to choose the criminal conduct;

(3) That the defendant had no reasonable legal alternative to violation of the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm; and

(4) That a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of threatened harm.

*United States v. Liu,* 960 F.2d 449, 453-54 (5th Cir.) *cert. denied,* 113 S.Ct. 418 (1992).  Clearly, the Parents-Appellants stated that they needed the material witnesses to establish the elements of a duress defense.  They stated: "these witnesses under the Government's [custody] are exculpatory regarding the Defendants' well founded fear for leaving their country and being forced to come here with no alternative to seek safety to avoid the harm."   See Transcript of Bench Trial/Sentencing at 8-9 (Dkt. No. 49.)  But the government never provided specific information as to the whereabouts of the children.  Even Magistrate Judge Torres told the Parents-Appellants:

I lament it more than you that I am in a position where I am unable to give you any information or I am not in possession of any information regarding the whereabouts or well being of your children, and I wish that was not so.  I wish I could give you that information because I know your are worried about it.  I can see it on your faces, and I can hear it in your voices that you are concerned, and that's probably the single most important thing to you in your lives, and any of us who are blessed to be parents understand that is the single

most important thing we have in our lives.  I wish I could give you that information, believe me, and I hope you understand that.

<u>See</u> Transcript of Bench Trial and Sentence at pp. 48-49 (Dkt. No. 49.)

The Supreme Court held long ago that a "fair trial in a fair tribunal is a basic requirement of due process."  *In re Murchison,* 349 U.S. 133, 136 (1955).  "Fairness of course requires an absence of actual bias in the trial of cases.  But our system of law has always endeavored to prevent even the probability of unfairness."  *Id.*  Here, the parents made "well-founded fear claims" of persecution or torture from the beginning.  Clearly, their children as material witnesses, if available, could have corroborated those claims.  The Parents-Appellants would have been able to provide the children's testimony to establish that (1) they were under an immediate threat of death or serious bodily injury in their Central American countries, [3] (2) they had a well-grounded fear that the threats would be carried out, (3) they did not recklessly or negligently place themselves in a situation where it was probable that they would be forced to choose to come to the U.S., (4) they had no reasonable alternative but to come to the U.S. in order to escape violence, and (5) there was a direct causal relationship between coming to the U.S. and entering illegally and the avoidance of the threatened violence in their Central American countries.  However, the Parents-Appellants, unjustly and unfairly, were <u>not</u> afforded the opportunity to present such testimony from the children. The defense was not given the opportunity to directly examine these key material witnesses regarding the Parent-Appellants' claims of duress and "well-founded fear."  The government's mechanism of separating the Parents-Appellants from their children thus depriving the Parents-Appellants from a full and fair opportunity to present testimony on their behalf falls

---

[3]The violence in Honduras and El Salvador has been well documented.  *See* https://www.cfr.org/backgrounder/central-americas-violent-northern-triangle.

short from the vital hallmark of a full and fair hearing under the Due Process Clause. *Natel,* 812

F.2d at 943.

### 2. The government's mechanism of separating the Parents-Appellants from their minor children is a coercive calculated measure that violates the Parents-Appellants' right against self-incrimination.

With respect to their children, the Parents-Appellants stated at the bench trial:

> The fact that these children, the key material witnesses, are missing is a violation of due process rights for a trial and of their right against defendants' right against self-incrimination.  It forces them to take the stand in order to establish their defense and there is prejudice.

<u>See</u> Transcript of Bench Trial/Sentencing at 8-9 (Dkt. No. 49.)

"[T]he prohibition of compelling a man in a criminal court to be a witness against himself

is a prohibition of the use of physical or moral compulsion to extort communications from him . .

." *Holt v. U.S.,* 218 U.S. 245, 252-53 (1910).  "The Fifth Amendment provides that no person

shall be compelled in any criminal case to be a witness against himself." *Lefkowitz v. Turley,* 414

U.S. 70, 77 (1973).  "The Amendment not only protects the individual against being involuntarily

called as a witness against himself in a criminal prosecution but also privileges him not to answer

official questions put to him in any other proceeding, civil or criminal, formal or informal, where

the answers might incriminate him in the future criminal proceedings." *Id.*  The Supreme Court

has invalidated impermissible **coercive government action** which has as its goal compulsion of

self-incriminatory statements. *Id; see also Gardner v. Broderik,* 392 U.S. 273 (1968).

The Supreme Court has observed:

> [The privilege against self-incrimination] reflects many of our fundamental values and most noble aspirations; our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference of an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates a

fair state-individual balance by requiring the government in its contest with the individual to shoulder the entire load; our respect for the inviolability of human personality and of the right of each individual to a private enclave where he may lead a private life[;] our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes as shelter to the guilty, is often a protection to the innocent."

*United States v. Balsys,* 524 U.S. 666, 690 (1998) (quoting *Murphy v. Waterfront Comm'n of N.Y. Harbor,* 378 U.S. 52, 55 (1964)).

Here, the government orchestrated a situation where the Parents-Appellants would have had to testify against themselves at trial.  This is so because the government implemented:

(1) the coercive tactic of punishing the Parents-Appellants by separating them from their minor children in spite of the Parents-Appellants' "credible fear claims," and

(2) the coercive tactic of not making the minor children available for any of the proceedings, including trial, ***knowing that:*** (a) the minor children were in the company of the Parents-Appellants when immigration first encountered them, (b) the immigration forms state that the minors were the children of the Parents-Appellants; and (c) the children were the only witnesses who could corroborate the Parents-Appellants' "credible fear claims."

With the government's coercive mechanisms in place, the choice before the Parents-Appellants was either pleading guilty or going to trial and testifying against themselves!  *See Garrity v. State of New Jersey,* 385 U.S. 493, 497-98 (1967).  That, however, placed a penalty on the Parents-Appellants' self-incrimination privilege.  Moreover, the threat of indefinite separation from one's child was not only an additional penalty but also a powerful form of compulsion to force the Parents-Appellants to relinquish the privilege against self-incrimination.

However, the Supreme Court has consistently held that a penalty may not be placed upon one for exercising his privilege against self-incrimination.  *Spevack v. Klein,* 385 U.S. 511 (1967)

14

and *Slochower v. Board of Education, etc.,* 350 U.S. 551 (1956). In *Spevack,* the Supreme Court stated: "in this context 'penalty' is not restricted to fine or imprisonment, it means as we said in *Griffin v. California,* 380 U.S. 609, the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.'" *Spevack,* 385 U.S. at 515.

And here it was ultimately "costly" because four out of the five Parents-Appellants convicted have already been deported. See Supplemental Memorandum Regarding Defendants' Amended Response & Objection to Government's Motion to Amend/Correct the [Magistrate's] Opinion (Dkt. No. 65- Exhibit X). Each of these four Parents-Appellants was deported without his or her child, and nothing indicates they will be reunited anytime in the future. Indeed, a de facto termination of their parental rights occurred.

   3. **The government's mechanism of separating the Parents-Appellants from their minor children is a punishment that violates Due Process and the Eighth Amendment.**

   a. *Due Process and the Punishment of Detainees by Separating Families.*

The record clearly indicates that the Parents-Appellants were separated from their minor children shortly after their arrest. The Parents-Appellants were detained at the El Paso County Jail and charged with a *misdemeanor* illegal entry, and the whereabouts of their minor children was unknown to both the Parents-Appellants and the magistrate judge.

The Parents-Appellants argued before Magistrate Judge Torres that the separation from their minor children was: (1) a harsh punishment in violation of due process, and (2) a prejudicial punishment to both Parents-Appellants and their children because they were bona fide asylum seekers. (Dkt. No. 13.)

The Parents-Appellants cited to the *Flores Settlement* to illustrate Congress's intent regarding the family separation issue, i.e., to keep families together in immigration proceedings when immigration authorities detain accompanied minors. *See Flores v. Lynch,* 828 F.3d 898 (9th Cir. 2016); *Bunikyte ex rel. Bunikiene v. Chertoff,* No. 1:07-cv-00164-SS 2007 WL 1074070, at *1 (W.D. Tex. Apr. 9,m 2007). The Parents-Appellants informed the court that ICE's Parental Interests Directive provides:

> **Policy. ICE personnel should ensure that the agency's immigration enforcement activities do not unnecessarily disrupt the parental rights of both alien parents or legal guardians of minor children. Particular attention should be paid to immigration enforcement activities involving: 1) parents or legal guardians who are primary caretakers;** 2) parents or legal guardians who have a direct interest in family court or child welfare proceedings; 3) parents or legal guardians whose minor children are physically present in the United States and are USCs or LPRs. ICE will maintain a comprehensive process for identifying, placing, monitoring, accommodating, and removing alien parents or legal guardians of minor children while **safeguarding their parental rights.**

(Dkt. No. 13 at 4 citing August 23, 2013, U.S. Immigration and Customs Enforcement's (ICE) Parental Interests Directive in the Course of Civil Immigration Enforcement, available at: http://www.ice.gov/dcolib/detention-refrom/pdf/parental_interest_directive_signed.pdf.) They also informed the court that Congress has expressed its intent to keep children together with their parents when apprehended by immigration authorities. The Parents-Appellants noted that, when making appropriations to DHS, Congress stated:

> The report expresses concern regarding reports that children apprehended by DHS continue to be separated from their parents. The committee's report language encourages ICE to work with reputable nonprofit organizations to consider allowing family units to be placed in the intensive Supervised Appearance Program. **If detention is necessary, the report language encourages ICE to house family members together in nonpenal, home-like environments until the conclusion of their immigration proceedings.**

(Id. at 5 citing Department of Homeland Security Appropriations Act, 152 Cong. Rec. E1113-02, 2006 WL 1594390.) There is no question that in cases involving minor children, whether accompanied or unaccompanied, the family unit is of paramount concern to Congress. The

Parents-Appellants, who had no prior criminal history whatsoever, also pointed out to the magistrate court that the Supreme Court has explained that a parent's right to the custody of their child is among one of the "essential" and "basic civil rights of man." *Stanley v. Illinois,* 405 U.S. 645, 651 (1972).  The Parents-Appellants stated that the **Supreme Court, Congress, and the Flores Settlement** do <u>not</u> support the government's separation in their cases.  They contended that government's mechanism of separating and punishing the family unit while their § 1325 misdemeanor charges were pending despite the fact that they had made "credible fear claims" of persecution or torture, <u>clearly</u> perverted Supreme Court, Congressional, and Flores Settlement intent.  (Dkt. No. 13.)

The government contended that it provided a website and phone number for the parents so they could access information about their children.  But, as the record shows, the magistrate judge found that information to be insufficient and unhelpful.  <u>See</u> Transcript of Motion to Dismiss Hearing Dkt. No. 41 at 20-26 and 34-38.

The Supreme Court has long recognized constitutional limits on *pretrial detention* in relation to the protections under the Due Process Clause.  The Supreme Court has instructed that, in the case of pretrial detainees, "the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell v. Wolfish,* 441 U.S. 520 (1979).  In *Bell,* the Supreme Court explained:

> For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process law.  A person lawfully committed to pretrial detention has not been adjudged guilty of any crime.  He has had only a 'judicial determination of probable cause as a prerequisite [the] extended restraint of [his] liberty following arrest.'  And, if he is detained for a suspected violation of a federal law, he also has had a bail hearing.  Under such circumstances, the Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility **so long as those conditions and restrictions do <u>not</u> amount to punishment, or otherwise violate the Constitution.**

*Id.* at 535-37 (emphasis added) (citing *Ingraham v. Wright,* 430 U.S. 651, 671-72 n. 40, 674 (1977);

*Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 165-67, 186 (1963); *Wong Wing v. United States,*

163 U.S. 228, 237 (1896); *Gerstein v. Pugh,* 420 U.S. 103, 114 (1975); *Virginia v. Paul,* 148 U.S.

107 (1893); and 18 U.S.C. §§ 3146, 3148)).

Here, the government inflicted inhumane punishment prior to the Parents-Appellants'

misdemeanor § 1325 convictions.  By separating the families, the Parents-Appellants' cases

morphed from "credible fear claims" of persecution to a two-fold fear regarding the safety of their

children in a foreign country and the threat of never seeing them again because of deportation.

The Parents-Appellants' separation from their minor children *before* being convicted and while

their ***misdemeanor*** charges were pending stripped them of their parental rights.

The Supreme Court has instructed that, to determine whether a condition is punishment in

the Constitutional sense, a court must determine "whether an alternative purpose to which [the

restriction] may rationally be connected is assignable for it, and whether it appears excessive in

relation to the alternative purpose assigned [to it]."  *Bell,* 441 U.S. at 538-39 (quoting *Kennedy,*

372 U.S. at 168-69).  Accordingly, "[t]o determine whether a restriction on liberty constitutes

impermissible punishment or permissible regulation, we first look to legislative intent."  *United*

*States v. Salerno,* 481 U.S. 739, 747 (1987).  "Unless Congress expressly intended to impose

punitive restrictions, the punitive/regulatory distinction turns on 'whether an alternative purpose

to which [the restriction] may rationally be connected is assignable for it, and whether it appears

excessive in relation to the alternative purpose assigned [to it].'"  Id.

Here, Congress has expressly stated its intent regarding people, like the Parents-Appellants,

who make a "credible fear claim" of persecution or torture.  Under 8 U.S.C. § 1225(b)(1)(A)(ii) &

(B)(ii),  an alien arriving in the United States who indicates to the immigration officer that he or

she fears persecution or torture if returned to his or her country, the officer "shall refer the alien for an interview by an asylum officer" to determine if he or she "has a credible fear of persecution [or torture]." 8 U.S.C. § 1225(b)(1)(A)(ii) & (B)(ii); 8 C.F.R. § 208.30(d).

In that statute, Congress wrote the word "shall" for a reason!  Statutory language is generally construed according to the plain meaning of the words used by Congress "absent a clearly expressed legislative intention to the contrary." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980).  "The word 'shall' is ordinarily the language of command." *Alabama v. Bozeman,* 533 U.S. 146, 153 (2001).  The use of the word "shall" "normally creates an obligation impervious to judicial discretion." *Lexecon Inc. v. Millberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 35 (1998).

Here, the record indisputably shows that the Parents-Appellants made a "credible fear claim" of persecution or torture when they were encountered by immigration agents.  In fact, the government stipulated to all of the Parents-Appellants' I-213/I-831 immigration forms which state that, when the Parents-Appellants first encountered immigration agents, the Parents-Appellants expressly made a "credible fear claim" of persecution if returned to their respective Central American countries.  Accordingly, under the statute, the Parents-Appellants should have been referred to an asylum officer for an interview to determine if they had a credible fear of persecution or torture.  8 U.S.C. § 1225(b)(1)(A)(ii) & (B)(ii); 8 C.F.R. § 208.30(d).

Under the statute, Congress, by using the word "shall," commanded immigrations officers to refer individuals making a "credible fear claim" to asylum officers.  There is no doubt with respect to intent when the word "shall" is used in a statute.  Congress "says in a statute what it means and means what it says there." *Harford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6 (2000).  And, even "[w]hen government action depriving a person of life,

liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner." *Salermo,* 481 U.S. at 746. This requirement has traditionally been referred to as 'procedural' due process." *Id.* Here, the government disobeyed Congressional mandate, and the Parents-Appellants were deprived of the benefit under the asylum statute in an unfair manner.

"[I]f a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Bell,* 441 U.S. at 539. Here, it is clear that Congress, under the statute, commanded immigration authorities to refer a person who makes a "credible fear claim" of persecution or torture to an asylum officer to evaluate his or her claim. Likewise, it is well documented that the Supreme Court and Congressional objective in these types of cases is not to separate families. Separating the Parents-Appellants from their minor children is a restriction or condition that is not reasonably related to Congressional intent. *Bell,* 441 U.S. 538. It was simply inhumane punishment.

"It has long since ceased to be true that due process of law is heedless of the means by which otherwise relevant and credible evidence is obtained. . . . Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice.'" *Rochin v. California,* 342 U.S. 165, 172-73 (1952). Ordinarily in the United States a person accused of a ***petty misdemeanor*** is not punished by depriving him or her of the custody of her or his child for an indefinite period of time.

Moreover, the Parents-Appellants were also punished regarding their possible release on bond. The *Flores Settlement* provides for the <u>possibility</u> of the simultaneous release of the minor child and custodial parent after a bond hearing while immigration proceedings are pending. *Flores*

*v. Sessions III,* 862 F.3d 863, 868-69 (9th Cir. 2017). The *Flores Settlement* provides for an opportunity for the minor to be released on bond to a parent or guardian. And though the *Flores Settlement* does not provide an affirmative release right for the accompanying parent, a noncriminal alien may be released if he carries the burden of showing that he does not present a danger to others and is not a threat to national security or a flight risk. *Flores v. Lynch,* 828 F.3d at 909; *and In re Guerra,* 24 I. & N. Dec. 37, 38 (BIA 2006). Congress has expressed its intent of simultaneous release of the juvenile and the parent, legal guardian, or adult relative when they are apprehended together by immigration authorities. *See* Department of Homeland Security Appropriations Act, 151 Cong. Rec. E1025-01, 2005 WL 1185446.

In fact, Immigration and Customs Enforcement provides that if a parent, legal guardian or adult "cannot be located to accept custody of the juvenile, and the juvenile has identified a parent, legal guardian, or adult relative in Service detention, simultaneous release of the juvenile and the parent, legal guardian, or adult relative shall be evaluated on a discretionary case-by-case basis." *See* 8 C.F.R. § 1236.3(b)(2). Because the parent is the primary caretaker, available to take custody and care for his or her child, ICE's Parental Interest Directive supports the release of the parent so that he can resume his or her primary caregiver role. See August 23, 2013, U.S. Immigration and Customs Enforcement's (ICE) Parental Interests Directive in the Course of Civil Immigration Enforcement, available at: http://www.ice.gov/dcolib/detention-refrom/pdf/parental_interest_directive_signed.pdf. A child's unique vulnerability necessitates the release of the parent with the child. Id.

And, the Supreme Court has also remarked that parents should generally be considered for release along with their children:

> The Board of Immigration Appeals has stated that 'an alien generally . . . should not be detained or required to post bond except on a finding that he is a threat to the national

security . . . or that he is a poor bail risk.' . . In the case of arrested alien juveniles, however, the INS cannot simply send them off into the night on bond or recognizance.  The parties to the present suit agree that the Service must assure itself that someone will care for those minors pending resolution of their deportation proceedings.  That is easily done when the juvenile's parents have also been detained and the family can be released together[.]

*Reno v. Flores,* 507 U.S. 292, 295 (1993).

Furthermore, women or men who are bona fide asylum seekers, i.e., those who prove a credible fear of persecution, 8 U.S.C. § 1225(b)(1)(B)(iii)(IV), are eligible to receive an individualized assessment of whether detention is warranted if they prove a credible fear of persecution.  Here, nothing in the record indicates that these five parents do not qualify for asylum, much less that they pose any danger that would require their detention.  The government's mechanism of separating the family unit is against Congressional intent and resulted in punishment to the Parents-Appellants regarding the issue of a bond release.

Here, the record shows that Parent-Appellant Vasquez-Hernandez was recently given an immigration bond.  She was fortunate because a voluntary non-profit organization agreed to help her in immigration proceedings. The immigration judge granted Ms. Vasquez-Hernandez a bond, despite her § 1325 misdemeanor conviction.  See Dkt No. 65- Exhibit X.  Had the government complied with Congress's command to refer her to an asylum officer to determine her "credible fear claim" of persecution or torture, Ms. Vasquez-Hernandez would not have spent time in federal prison away from her daughter, and she would not have obtained a federal conviction under § 1325.  Furthermore, an immigration judge would not have granted a bond if he concluded that Ms. Vasquez-Hernandez lied when she encountered immigration authorities about the fact that she was with her child and that she had a viable "credible fear claim."

### b. *Due Process and the Punishment of Detainees by Disregarding Asylum Laws.*

Here, as previously stated, the record *clearly* indicates that the Parents-Appellants made a "credible fear claim" of persecution or torture when they were encountered by immigration authorities at the border.   The government, however, completely disregarded the Parents-Appellants' claim that they and their children were bona fide asylum seekers and never referred them to an asylum officer to evaluate their claims as commanded by Congress.

Aliens in the United States are entitled to due process.  *Zadvydas v. Davis,* 533 U.S.678, 693 (2001).  Due Process requires that an applicant **receives a full and fair hearing which provides a meaningful opportunity to be heard with an opportunity to present evidence.** *Li Hua Lin v. U.S. Dep't of Justice,* 453 F.3d 99, 104-05 (2nd Cir. 2006) (citing *Capric v. Ashcroft,* 355 F.3d 1075, 1087 (7th Cir. 2004)).  The law is clear!  An alien arriving in the United States who indicates to the immigration officer that he or she fears persecution or torture if returned to his or her country, "**shall** [be] refer[red] [] for an interview by an asylum officer" to determine if he or she "has a credible fear of persecution [or torture]."  8 U.S.C. § 1225(b)(1)(A)(ii) & (B)(ii); 8 C.F.R. § 208.30(d). (emphasis added).

Obtaining asylum would have been dispositive with respect to their § 1325 charge.  Simply put, if the Parents-Appellants obtained asylum, they would be able to remain in the country legally without violating § 1325.  The Parents-Appellants argued to the magistrate judge that going to trial was simply a mechanism by the government to strip the Parents-Appellants of their rights of meaningful protection under asylum and refugee immigration laws.   The Parents-Appellants claimed that the government was criminalizing the Parents-Appellants' act of seeking protection under U.S. asylum law by charging them under §1325 rather than affording them their due process rights by referring them to an asylum officer.

23

The denial of an opportunity to be heard regarding their asylum claims violated the due process rights of the Parents-Appellants simply because it denied them an opportunity to be heard regarding their asylum claim.  Due Process requires that a claimant receive a full and fair hearing which provides a meaningful opportunity to be heard and present evidence.  The Parents-Appellants now have a federal conviction under § 1325 and have been prejudiced with respect to any future asylum claim.  In fact, four of the five Parents-Appellants had now been deported without their children.  This would have been avoided if the government had simply complied with Congress's mandate to refer the Parents-Appellants to an asylum officer once they made a "credible fear claim" of persecution.

Moreover, in *Santosky v. Kramer,* the Supreme Court made it clear that termination of parental rights impinges upon a liberty interest of which a person may not be deprived without due process of law.  455 U.S. 745, 753-54 (1982).  Here, the Parents-Appellants argued to the magistrate judge that their conviction and likely deportation without their children resulted in a *de facto* termination of their parental rights.  Defense counsel recently filed a "Supplemental Memorandum Regarding Defendants' Amended Response & Objection to Government's Motion to Amend/Correct the Court's Opinion" to inform the magistrate court that four out of the five Parents-Appellants have been deported, and that nothing indicates that they were in the company of their children when they left the country.  Thus, their deportation has resulted in a *de facto* termination of their parental rights.  However, the permanent seizure of the minor children and indefinite separation from the Parents-Appellants resulting from their deportation occurred without the required meaningful hearing and opportunity to be heard.  Id.

### c.  The Eighth Amendment and the Punishment of Detainees by Separating families.

After the magistrate judge entered a judgment of guilt, the parents contended that with a conviction they would be deported and permanently separated from their children, thus, in effect terminating their parental rights and excessively punishing them.

The Parents-Appellants' punishment was their criminal conviction, not simply the imposition of a sentence of probation.  *See Ball v. U.S.,* 470 U.S. 856, 861 (1985).  The conviction has already resulted in the deportation of four out of the five Parents-Appellants without their children.  Nothing indicates that they left for their Central American countries in the company of their children.  Such a result is a *de facto* termination of their parental rights.  Certainly, there is no guarantee to be reunited with them.

The Supreme Court has instructed that: "the Clause forbidding 'cruel and unusual' punishments 'is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice."  *Gregg v. Georgia,* 428 U.S. 153, 171 (1976).  The focus is "on the lack of proportion between the crime and the offense."  *Id.*  "[T]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."  *Id.* at 173 (quoting *Trop v. Dulles,* 356 U.S. 86, 101 (1958)).  "Thus, an assessment of contemporary values concerning the infliction of a challenged sanction is relevant to the application of the Eighth Amendment."  *Id.*  "[T]his assessment does not call for a subjective judgment.  It requires, rather, that we look to objective indicia that reflect the public attitude toward a given sanction."  *Id.*

In instructing how to analyze if a punishment violates the Eighth Amendment, the Supreme Court observed:

But our cases also make clear that public perceptions of standards of decency with respect to criminal sanctions are not conclusive.  A penalty must accord with 'the dignity of man,' which is the 'basic concept underlying the Eighth Amendment.'  This means, at least, that the punishment not be 'excessive.'  When a form of punishment in the abstract [] rather than in the particular [] is under consideration, the inquiry into 'excessiveness' has two aspects.  First, the punishment must not involve the unnecessary and wanton infliction of pain.  Second, the punishment must not be grossly out of proportion to the severity of the crime.

*Id.* (citations omitted).  "[T]he Amendment imposes some obligations on the judiciary to judge the constitutionality of punishment and that there are punishments that the Amendment would bar whether legislatively approved or not."  *Id.* at 174.

With the above precepts in mind, the indefinite separation and probable termination of parental rights after conviction and deportation of the Parents-Appellants without their minor children is a punishment that the Amendment would bar.  The punishment for these Parents-Appellants is both (1) unnecessary infliction of pain because it could have been avoided had the government complied with the asylum statute and Congressional intent, and (2) grossly disproportionate considering that the Parents-Appellants were convicted of a ***petty misdemeanor.***

The judiciary must ensure that a penalty "is not cruelly inhumane or disproportionate to the crime involved."  *Id.* at 175.  And here the punishment of family separation for an indefinite period of time is both cruelly inhumane and disproportionate.

**4.  The government's mechanism of separating the Parents-Appellants from their minor children is a coercive calculated measure that violates *Brady* and Due Process.**

At the bench trial, the Parent-Appellants argued to Magistrate Judge Torres that the fact that these key material witnesses were missing constituted a violation of the Parents-Appellants' due process rights to a fair trial because they could not fairly assert a defense.  The Parents-Appellants explained that these children were key to the Parents-Appellants' claim that they left

their countries with their minor children to escape horrible violence in their Central American countries. *They told Magistrate Judge Torres that information concerning the whereabouts of these key material witnesses was <u>not</u> provided by the government in the discovery.* <u>See</u> Transcript of Bench Trial/Sentencing at 8-9 (Dkt. No. 49)  They stated that these witnesses, under the government's custody, were clearly exculpatory regarding the Parents-Appellants' well-founded fear for leaving their country to avoid harm. <u>Id.</u>

"Prosecutorial suppression of evidence favorable to the defense 'violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Johnson v. Dretke,* 394 F.3d 332, 336 (5th Cir. 2004).  *"A defendant need not request the favorable and material evidence to trigger the prosecution's duty to disclose."  Id.* (citing *Strickler v. Greene,* 527 U.S. 263, 280 (1999) ("We have since *[Brady]* held that the duty to disclose such evidence is applicable even though there has been no request by the accused and that the duty encompasses impeachment evidence as well as exculpatory evidence.").

In the context of evidence favorable to the defense, the Fifth Circuit, relying on Supreme Court precedent, has explained:

> *Brady* requires the government to disclose to criminal defendants favorable evidence, material to guilt or punishment.  Materiality requires 'an exculpatory value that was apparent before the evidence was destroyed' and that was 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.  Moreover, 'evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.  Absent a showing of bad faith, failure to preserve potentially useful evidence does not constitute a denial of due process.  In sum, impermissibly withheld evidence must be either (1) material and exculpatory or (2) only potentially useful, in combination with a showing of bad faith on the part of the government.

*United States v. Moore,* 452 F.3d 382, 387-88 (5th Cir. 2006).

Accordingly, evidence is material if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682 (1985). And, "the prudent prosecutor will resolve doubtful questions in favor of disclosure." *United States v. Agurs,* 427 U.S. 97, 108 (1976).

"A valid *Brady* complaint contains three elements: (1) the prosecution must suppress or withhold evidence, (2) which is favorable, and (3) material to the defense." *United States v. Auten,* 632 F.2d 478, 481 (5th Cir. 1980). The Fifth Circuit has explained:

> The basic import of *Brady* is that there is an obligation on the part of the prosecution to produce certain evidence actually or constructively in its possession or accessible to it in the interests of inherent fairness.
> . . . .
> The leading articles on enhanced criminal discovery emphasize what we stress here, that *Brady* and other means or criminal discovery indicate the need for disclosure of important information known or available to the prosecutor in order to promote the fair administration of justice.
> The need [] is premised on the fact that the prosecutor has ready access to a veritable storehouse of relevant facts and, within the ambit of constitutional, statutory and jurisprudential directives, this access must be shared 'in the interests of inherent fairness . . . to promote the fair administration of justice.' If disclosure were excused in instances where the prosecution has not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government. This we decline to do.
> . . . .
> [And, contention by the prosecution] that it was not in possession of the information requested by the defendant because it was in possession of another government agency is **not** an excuse or lack of knowledge for purposes of the disclosure requirements.

*Id.* (emphasis added).

Here, the record clearly establishes that the children witnesses key to the Parents-Appellants' duress defense, based on their "credible fear claims" of persecution or torture in their native Central American countries of Honduras and EL Salvador, are in the possession of the Office of Refugee Resettlement (ORR), a government agency. See Transcript of Motion to Dismiss Hearing Dkt. No. 41 at 20-26 and 34-38. Accordingly, the witnesses are in the

government's possession and it is undisputable that the government did not provide any information to the defense or the court regarding their specific whereabouts.

Next, with respect to the need that the evidence be favorable to the defense, the Fifth Circuit has observed that: *"Brady* requires disclosure of evidence favorable to the accused on the issue of guilt as well as evidence which serves to impeach the testimony of adverse witnesses. *Id.* at 482 (citing *United States v. Gaston,* 608 F.2d 607 (5th Cir. 1979); *United States v. Anderson,* 574 F.2d 1347 (5th Cir. 1978); *Williams v. Dutton,* 400 F.2d 797 (5th Cir. 1968), cert. denied, 393 U.S. 1105 (1969).

Here, the Parents-Appellants' I-213/I-831 immigration forms (except for that of Claudino-Lopez) reflect that, at the time the Parents-Appellants encountered immigration agents, they **expressly** made a "credible fear claim" of persecution if returned to their respective Central American countries.  Also, each of the I-213/I-831 immigration forms (except for that of Zavala-Zavala) **expressly** states that the Parents-Appellants were apprehended with either their son or daughter.  The forms also indicate that the separation was approved by the government.  The testimony of the children witnesses certainly would be favorable to the Parents-Appellants' duress claims based on their "credible fear claims" of persecution because they could have corroborated the Parents-Appellants' duress claims.

Lastly, "[t]he third element, materiality, is weighed against one of four distinct situational standards: (1) the prosecutor has not disclosed evidence when there has been a specific request, (2) the prosecutor has not disclosed information when there has been a general request or no request, (3) the prosecutor knows or should have known that the conviction is based on false evidence, and (4) the prosecutor fails to disclose, in the absence of a specific request, evidence which is relevant only for impeachment." *Id.* (citation omitted).

Here, the situational standards overlap.  Throughout the process the defense and magistrate judge were kept in the dark as to the whereabouts of the children despite the claims of affliction by the Parents-Appellants.  And, the prosecution knew of the Parents-Appellants' immigration forms and that they expressly stated that the Parents-Appellants made "credible fear claims" of persecution and that they were traveling with their minor children when they were apprehended.  In fact, the government stipulated to these immigration forms containing "credible fear claims" at the bench trial.  And, despite this, the government resorted to the coercive tactic of keeping the Parents-Appellants, defense counsel, and the magistrate judge in the dark with respect to the whereabouts of the children.  In fact, the lawyer for the government indicated to the magistrate judge the nothing compelled him to provide any information to anyone regarding the children witnesses.  *See* Transcript of Motion to Dismiss Hearing at 19 (Dkt. No. 41).

Because the government kept custody of these witnesses at all times and never provided specific information about their whereabouts to the court, these key material witnesses were never able to testify in support of their Parent-Appellants' claim of fear.  Defense counsel was not able to directly examine these key material witnesses regarding the Parents-Appellants' claim of duress, i.e., that they had a well-founded fear of persecution.

The government filed a Motion to Amend/Correct the magistrate judge's written opinion contending that the minor children may not be the Parents-Appellants' real children.  The Parents-Appellants, however, opposed and objected to the government's motion.  (Dkt. No. 59.)

The Parents-Appellants stated that the government waived its objection to the Magistrate's determination that the minors involved in these cases are the children of the Parents-Appellants.  The government did not address or properly articulate an objection to contradict Magistrate Judge Torres' determination that the minors involved were the children of the Parents-Appellants.  Id.

The government failed to pursue its vague claim that the children were not the defendants' children.  Id.  The Parents-Appellants stated that simply stating that the government "doesn't necessarily know" whether the minors involved are the children of the Parents-Appellants is not the same as providing facts, legal citations, arguments or analysis to contradict Magistrate Judge Torres' determination.  Id.  Thus, the government **intentionally** failed to pursue or press on the issue.  Id.  In fact, when given a chance by Magistrate Torres to do so, the government intentionally abandoned the issue by not providing support for its contention.  Id.  At the motion to dismiss hearing, the following colloquy between Magistrate Torres and government took place:

> THE COURT: So the government's default is that they're not the parents?

> MS. FRANCO-GREGORY: No, Your Honor.  But—and, again, we're going so far away from—from the issues at hand, which is a criminal prosecution of a misdemeanor illegal entry into the United States.  And the government would re-urge what is contained within the brief, that the issue as far as providing them notice as to the status of the child that they were accompanied with *is not ripe* at this time.

*See* Transcript of Motion to Dismiss Hearing at pages 46-47 (Dkt. No. 41).  Clearly, the government elected to pursue the § 1325 charge and failed to pursue the vague claim that the children were not the Parents-Appellants' children.  Throughout all the proceedings, the government failed to provide evidence to support its contention, thus, it waived that issue.  *United States v. Beaumont,* 972 F.2d 553, 563 (5th Cir. 1992).  Federal courts are courts governed by rules of evidence and simply stating "we do not know" or "is not ripe" does not equate to providing facts, arguments or analysis to contradict that the minors involved in these cases are the children of the Parents-Appellants.  That statement in itself does not prove or disprove anything.  A proper objection requires a distinct statement of the matter objected to and the specific ground of the objection.  *See* Fed. R. Evid. 103(a)(1); *United States v. Williams,* 990 F.2d 507, 511 (9th Cir. 1993).

The Parents-Appellants also noted that Magistrate Torres' determination that these cases involved the children of the Parents-Appellants is supported by the record and is not clearly erroneous.  *See* 28 U.S.C. § 636(b)(1)(A)  and (Dkt. No. 59.)  Here, the five Parents-Appellants provided oral testimony to Magistrate Torres, who as the trier of fact, heard from them with respect to their children throughout all the proceedings.  (Dkt. No. 59.)  They also provided documents written by immigration officers (who are government employees/agents and had face to face contact with them), which indicate that: (1) the minors involved were the Parents-Appellants' children, (2) the Parents-Appellants and their children left their Central American countries to escape violence, and (3) the Parents-Appellants made a "credible fear claim."  (Dkt. No. 59.)

The Parents-Appellants noted that Magistrate Torres heard testimony that all Parents-Appellants were accompanied by their minor children when they entered the country.  Id. Magistrate Judge Torres, as the trier of fact, was there to observe and weigh the credibility of the witnesses.  He heard testimony from all five Parents-Appellants at the detention and sentencing hearings concerning their separation from their children.  Id.  The Magistrate Judge heard these witnesses' testimony concerning their fear for their children's safety.  Id.  In addition, the Magistrate Judge also reviewed the stipulated evidence submitted at trial.  Id.  Here, the record clearly shows that Magistrate Judge Torres correctly determined that these cases involved the Parents-Appellants' children.  United States Magistrate Judge Torres, on the record, stated that he is aware of the government's practice regarding the family separation issue and of the cases, like the *Flores* case, that document that particular issue.  (Dkt. No. 3.)  That is why Magistrate Torres: (1) referred to the minors as the Parents-Appellants' children throughout all the proceedings, and (2) stated on the record that he reached out to the Office of the Federal Defenders Office to handle these cases.  Id.  With respect to the Parents-Appellants' serious concerns of being separated from

32

their minor children, Magistrate Torres <u>stated on the record</u>: "I don't think there is a lot of reason to doubt the sincerity of those expressions in most cases." *See* Transcript of Status Conference dated November 1, 2017 at page 5 (Dkt. No. 54.)  Magistrate Judge Torres' determination that these misdemeanor cases involved the children of the Parents-Appellants is supported by the record and is <u>not</u> clearly erroneous. *See United States v. Raddatz,* 447 U.S. 667, 673 (1980) (a *clearly erroneous* standard of review is applied for non-dispositive findings by a magistrate judge).

The Parents-Appellants also noted that it is a common practice for the government to separate the parents from their children in these type of cases. **The government has separated families in this district before!** *Flores v. Lynch,* 828 F.3d 898 (9th Cir. 2016), *Bunikyte ex. Rel. Bunikiene v. Chertoff,* N. 1:07-cv-00164-SS 2007wl1074070, at *1 (W.D. Tex. Apr. 9, 2007), and *In re Hutto Family Dt. Ctr.,* No. 1:07-cv00164-SS, Dkt. 94, (W.D. Tex. Aug. 26 2007) document this practice by the government.  (Dkt. No. 59.)  Most recently, the government is facing yet another lawsuit for that practice in the Southern District of California for separating a mother from her minor daughter.  *See Flores v. Lynch,* 3:18-cv-00428-DMS-MDD, Dkt. 1 (S.D.C. Feb. 26, 2018)

If indeed there was doubt that the minors were the Parents-Appellants' children (1) the Parents-Appellants would have been charged with a more serious crime, not a petty misdemeanor; (2) as the magistrate judge noted, it is inconsistent for the government to claim that the Parents-Appellant are not the parents, but at the same time provide Parents-Appellants with a document from the Office of Refugee Resettlement (ORR) informing them how they can try to obtain information regarding the children (see Magistrate's Opinion at 19; Dkt. No. 51.); and (3) as noted in the Parents-Appellants' "Supplemental Memorandum Regarding Defendants' Amended Response & Objection to Government's Motion to Amend/Correct the Court's Opinion," an

immigration judge recently granted a bond in the case of Ms. Vasquez-Hernandez. (Dkt. No. 65.) An immigration judge would not grant a bond to a person recently convicted under § 1325 knowing that the Parent-Appellant is not the real mother of the child with whom she was apprehended by immigration authorities. Ms. Vasquez-Hernandez's "credible fear claim" is well documented. See https://www.expressnews.com/news/local/article/Her-husband-murdered-her-son-taken-away-a-12466253.php; *see also* https://www.houstonchronicle.com/news/houston-texas/houston/article/Trump-moves-to-end-catch-and-release-12383666.php; *see also* https://fronteralist.org/2018/01/02/family-separation-at-the-border-houston-chronicle/; *see also* www.latimes.com/nation/la-na-immigrant-family-separations-2018-story.html.

There is no question that the government's duty to disclose under *Brady* reaches beyond evidence in the prosecutor's actual possession. Since *Giglio,* 405 U.S. 150 (1972), the Supreme Court has made it clear that prosecutors have "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley,* 514 U.S. 419, 437 (1995); *United States v. Antone,* 603 F.3d 566, 569 (5th Cir. 1979). *"Giglio* involved a violation of due process predicated upon a failure, pre-trial, to disclose material evidence favorable to the defense, which then led to the prosecution's presentation of evidence contrary to the favorable evidence at trial." *Johnson v. Dretke,* 394 F.3d at 332, 336 (5th Cir. 2004) (citing *Giglio,* 450 U.S. at 151-53). Thus, if the government really had a doubt regarding the fact that the Parents-Appellants were the real parents of the minors, it had a duty to verify that fact. The government's tactic of saying it does not know if these minors are the Parents-Appellants' children is simply an attempt to undermine the Parents-Appellants asylum claims that should have been decided by an asylum officer.

It is important to note that the government has **unsuccessfully** argued before other federal courts that deporting bona fide asylum seekers, including family units, would serve as a deterrent to mass migration.  The government contended that the benefits of the *Flores Settlement* has mislead Central American families to think that a "permiso" awaited them in the United States.  In that litigation, the government argued to the District Court for the Central District of California and, subsequently, to the Ninth Circuit, as follows:

> [M]inors in Government custody with their parents were **not** the contemplated beneficiaries of the [Flores] Agreement . . . Further, in 1997, the parties could not have anticipated the 2014 influx of UACs [Unaccompanied Children] and families (including alien children accompanied by their parents) crossing the Southwest border of the United States . . . that make family detention an essential tool for immigration enforcement today. . . . In light of these changed circumstances, and the resulting need for family detention in order to combat the misconception that encourage migration, **it is neither equitable nor in the interest of public safety to read this Agreement to render DHS powerless to take any action whatsoever to deter the arrival of families illegally crossing the border with minor children in the substantial numbers that are seen today. . . . Modification is also necessary because the inability to operate family residential facilities would essentially mean that CBP and ICE would be required to allow families to illegally cross the border and enter the interior of the United States without immediate consequence (and also without significant assurance that they will appear at removal proceedings).**

However, the government's argument was shot down by federal courts.  *See Flores v. Lynch,* N. 2:85-cv-04544-DMG-AGR, Dkt. 120 at  19-20 and 23 (C.D.C. Feb. 27, 2015) and *Flores v. Lynch,* 828 F.3d 898, 909-910 (9th Cir. 2016); *see also Flores v. Sessions,* 862 F.3d 863 (9th Cir. 2017). The government is trying yet another argument.  It knows that its "we do not know" argument makes the parent or guardian deportable under § 1325 and deters migration by family-units, something the government continues to *desperately* try to accomplish.

This Court should be mindful of what the Supreme Court said over 80 years ago with respect to *a United States Attorney's use of unfair, sneaky and calculated methods:*

> **The United States Attorney** is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its

obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor-indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his **duty to refrain from improper methods calculated** to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States,* 295 U.S. 78, 88 (1935).  Lawyers owe duty of candor to the tribunal and a prosecutor for the government <u>cannot</u> argue facts or inferences that are not supported by the evidence in the case or that the prosecutor knows are false or has very strong reason to doubt.  *United States v. Corona,* 551 F.2d 1386, 1390 (5th Cir. 1977).  Accordingly, the government's argument that the minors involved may not be the Parents-Appellants' children simply displays a lack of candor.

Furthermore, if the minors involved were not the real children of the Parents-Appellants, the government would have charged Parents-Appellants with smuggling felonies, <u>not</u> just petty misdemeanors.  Instead, the government stipulated at trial to an exhibit of official government immigration documents that are stamped with the words "credible fear claim" and refer to the minors as the Parents-Appellants' children.  Certainly, the government's stipulation to documents stating that the minor children were the children of the Parents-Appellants **contradicts** the government's current claim that the minors are not the Parents-Appellants' children.  The fact that the government stipulated to documents stating that the children were the children of the Parents-Appellants waives that issue.  *The words of the parties manifest their intent or position with respect to a waiver.  International Ins. Co. v. RSR Corp.,* 426 F.3d 281, 300 (5th Cir. 2005).

Even assuming that the missing witnesses would amount to only potential useful evidence, the government acted in bad faith.  Potentially useful evidence, as defined in *Youngblood,* is "evidentiary material of which no more can be said than that it could have been subjected to tests,

the results of which might have exonerated the defendant." *Arizona v. Youngblood,* 488 U.S. 51, 57 (1988).  In *California v. Trombetta,* 467 U.S. 479, 489 (1984), the Supreme Court held that the government violates the defendant's right to due process if the unavailable evidence possessed exculpatory value, and it could not be obtained by other means.  *Id.*  The Supreme Court then added a third requirement for establishing a due process violation in *Youngblood,* 488 U.S. at 57-58, holding that the defendant must demonstrate that the government acted in bad faith in failing to preserve the potential useful evidence.  *Id.  Youngblood's* bad faith requirement dovetails with the first part of the *Trombetta* test—that the exculpatory value of the evidence is apparent.  *Id.*

The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the unavailable evidence because without knowledge of the potential usefulness of the evidence, the evidence could not have been held in bad faith.  *Youngblood,* 488 U.S. at 56 n.  Thus, the question of bad faith turns to what the government knew at the time it separated the children from their parents.  Id.  Here, official immigration documents state that the Parents-Appellants made a "credible fear claim" and that the minors were their children. Government officials wrote those facts on official government forms!   The fact that the government consciously kept these witnesses hidden is sufficient to establish "a conscious effort to suppress exculpatory evidence," thereby acting in bad faith.  *Trombetta,* 467 U.S. at 488.

### 5.  The government's mechanism of separating the Parents-Appellants from their minor children to obtain the Parents-Appellants' *petty misdemeanor convictions* constitutes "outrageous government conduct."

*Outrageous government conduct* is conduct by the government which "is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction."  *U.S. v. Russell,* 411 U.S. 423, 432-33 (1973).  It is conduct that "violat[es]

fundamental fairness, *shocking the universal sense of justice,* mandated by the Due Process Clause

of the Fifth Amendment.  *Id.* (citing *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246

(1960)).  In *Rochin v. California,* 342 U.S. 165 (1952), the Supreme Court found that the

government's conduct *"shocked"* the conscience because the government:

> Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and
> remove what was there, the forcible extraction of his stomach's contents— this course of
> proceedings by agents of government to obtain evidence is bound to offend even hardened
> sensibilities.   They are methods too close to the rack and the screw to permit of
> constitutional differentiation.

*Rochin,* 342 U.S. at 172.  Here, contrary to the *command* from Congress that the government

"shall" refer individuals making a "credible fear claim" to asylum officers, the government

separated the Parents-Appellants from their minor children.  With the exception of one, the

Parents-Appellants have been deported and their parental rights have been indefinitely suspended,

if not terminated.  These deported Parents-Appellants do not know if they will ever be reunited

with their children again.  This in itself "is bound to offend even hardened sensibilities."  But, there

is more!

After the government took custody of their children without providing information about

their whereabouts, the government offered the Parents-Appellants plea agreements with a sentence

of time served.  This was a legal fiction because the Parents-Appellants would likely have been

able to obtain the same result on their misdemeanor charges since they did not have any prior

criminal record.  This outrageous conduct gave the false impression that the Parents-Appellants

could put this matter behind them and be quickly reunited with their children.  *See* Dkt. No. 40;

Transcript of Hearing on Motion to Continue at pages 5-17.  Furthermore, as a mechanism to

bypass the resolution of the Parents-Appellants' motion to dismiss, the government filed a trial

motion, i.e, the *Lafler/Frye* motion, while the Parents-Appellants' <u>pretrial</u> motion to dismiss was pending. <u>Id.;</u> see also Dkt. No. 59.

In fact, the government's conduct is so *outrageous* that they even breached international law. *See* United Nations High Commissioner for Refugees Guidelines on the Applicable Criteria and Standards Relating to the Detention of Asylum-Seekers and Alternatives to Detention (2012) available at www.unhcr.org/refworld/docid/503489533b8.html ("Detention [of asylum-seekers] must not be arbitrary, and any decision to detain must be based on an assessment of the individual's particular circumstances. . . . Detention can only be exceptionally resorted to for a legitimate purpose. Without such a purpose, detention will be considered arbitrary, even if entry was illegal."). The government engaged in this outrageous arbitrary conduct for the sole reason to obtain *a petty misdemeanor conviction* from each Parent-Appellant who sought the asylum protections afforded by Congress.

Here, the government deliberately deprived the Parents-Appellants of their benefits under asylum law. The government's practice was unjustifiable. "[H]istory reflects the traditional and common-sense notion that the Due Process Clause, like its forebear in the Magna Carta, . . . was intended to secure the individual from the arbitrary exercise of the powers of government." *Daniels v. Williams,* 474 U.S. 327, 331 (1986). "[S]ubstantive due process prevents the government from engaging in conduct that shocks the conscience." *United States v. Salermo,* 481 U.S. 739, 746 (1998). The conclusion here is easier than the one in *Rochin.* Put simply, the facts at bar are simply worse than in *Rochin.*

## CONCLUSION

FOR THESE REASONS, the Parents-Appellants' convictions should be reversed.

Respectfully submitted,
MAUREEN SCOTT FRANCO
Federal Public Defender
/s/
SERGIO GARCIA
Assistant Federal Public Defender
Western District of Texas
700 E. San Antonio, D-401
El Paso, Texas  79901
(915) 534-6525

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of March 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

/s/

_____
Sergio Garcia
Attorney for Defendant