**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | § |
| | § |
| | § |
| **Plaintiff-Appellee** | § |
| | § |
| **v.** | § **No. 3:17-CR-02660-KC** |
| | § |
| **BLANCA NIEVE** | § **Consolidated case Nos.** |
| **VASQUEZ-HERNANDEZ, ELBA LUZ** | §    **3:17-CR-02661-KC** |
| **DOMINGUEZ-PORTILLO, MAYNOR** | §    **3:17-CR-02662-KC** |
| **ALONSO CLAUDIO LOPEZ, JOSE** | §    **3:17-CR-02663-KC** |
| **FRANCIS YANES-MANCIA,** | §    **3:17-CR-02664-KC** |
| **NATIVIDAD ZAVALA-ZAVALA** | § |
| | § |
| **Defendant-Appellants,** | § |
| | § |

## <u>ORDER</u>

This consolidated appeal illustrates the difficult and controversial nature of our country's immigration laws and their enforcement.   Appellants are five asylum seekers who were apprehended shortly after entering into the United States with their minor children.   Ultimately, they were separated from the children, prosecuted by the government for the misdemeanor offense of improper entry under 8 U.S.C. § 1325(a), and found guilty by the Magistrate Court after separate trials.   On appeal, Appellants challenge only their criminal convictions.   Although Appellants' separation from their children is a cause of great concern not only for Appellants but also for many in public at large, the soundness of the government's policies regarding arriving asylum seekers and their minor children is not before the Court in this appeal.   Because this Court finds no error in the proceeding below, the judgment of the Magistrate Court is affirmed.

## I.

Appellants are citizens of El Salvador and Honduras.   Each was apprehended by agents from United States Customs and Border Protection ("CBP") in unrelated incidents between October 21 and October 23, 2017, moments after they crossed into the United States from Mexico at a place that was not designated as a port of entry.   At the time of their apprehension, Appellants were not alone; each was traveling with their minor child or grandchild.[1]

During initial processing by CBP, Appellants sought asylum based on a fear of persecution in their home countries.   Shortly after, Appellants were charged by complaint with improper entry of an alien under 8 U.S.C. § 1325(a).   In addition, because Appellants did not possess documentation establishing a familial relationship with the minor children, CBP concluded that they were unaccompanied minors and transferred custody of the children to the Office of Refugee Resettlement ("ORR").

### A.

At each of their initial appearances, the Magistrate Judge asked Appellants whether they were traveling with a minor child or sibling and, if so, whether the government had provided any information regarding the child's whereabouts or well-being.   Initial Appearance Tr. at 7–8, ECF No. 14.[2]   Appellants responded that they had received little or no information regarding their

---

[1] Appellants Blanca Nieve Vasquez-Hernandez, Elba Luz Dominguez-Portillo, Maynor Alonso Claudio Lopez, and Jose Francis Yanes-Mancia were traveling with their minor children.   Appellant Natividad Zavala-Zavala was traveling with her minor grandchild.

[2] A record from the trial court in the form of a single, paginated document does not exist for any of these cases.   Rather, the trial record is comprised of individual entries that can be found on the Court's electronic docketing system.   Because the entries in each of Appellants' underlying cases are substantively identical, the Court cites only to the docket entries in *United States v. Vasquez-Hernandez*, No. 3:17-MJ-4499 (W.D. Tex.), to establish the background facts.   Similarly, although these cases have been consolidated on appeal, identical briefing is available in five separate electronic dockets.   Therefore, the Court cites to the entries in *United States v. Vasquez-Hernandez*, No. 3:17-CR-2660 (W.D. Tex.) when citing to the parties' briefs.   In sum, citations to any materials other than the briefing can be found at 3:17-MJ-4499, and citations to the briefing can be found at 3:17-CR-2660.

children.   *Id.*   Concerned about the legal impact that Appellants' separation from the children could have on the criminal proceedings, the Magistrate Judge scheduled a status conference to discuss the issue with counsel.

At the status conference, the Magistrate Judge explained that he had noticed a marked increase in cases where migrants that claimed to have been accompanied by their minor children were charged with improper entry and separated from the children at their time of arrest.   Status Conference Tr. at 2–3, ECF No. 54.   Similar to Appellants, the defendants in those cases often told the Court that they were kept in the dark concerning their children's whereabouts and well-being.   *Id.*   The Magistrate Judge went on to express concern that, should Appellants consider pleading guilty, their pleas might be susceptible to a future challenge as involuntary.   *Id.* at 4–5.   Given Appellants' inability to communicate with their children during the course of the criminal proceedings, the Magistrate Judge posited that Appellants might be induced to plead guilty based solely on their understandable desire to reunite with the children as quickly as possible.   *Id.*

In response to the Magistrate Court's request for briefing, counsel for Appellants informed the Court that he was already preparing a dispositive motion for each of Appellants' cases that would address the issues raised by the Court.   *Id.* at 9.   Agreeing that Appellants were similarly situated as to the Magistrate Court's concerns, the government consented to consolidate Appellants' cases for the purposes of the briefing.   *Id.* at 10.   Following the status conference, the Magistrate Court entered a briefing schedule, and Appellants filed a motion to dismiss several days later.   *See generally* Mot. to Dismiss, ECF No. 13.

### B.

Appellants' motion essentially raised four arguments in support of dismissal.   First,

Appellants argued that the government's actions in these cases were inconsistent with previous expressions of governmental policy relating to families detained for violating immigration laws. *Id.* at 3–8.   In essence, Appellants asserted that various federal entities have expressed a preference that families remain unseparated as they navigate immigration-related proceedings, and that this preference runs counter to "the government's mechanism of separating the family unit and simultaneously charging and prosecuting [Appellants] with a § 1325 crime."   *Id.* at 8.

Second, Appellants argued that the government violated their right to due process by charging them with improper entry before resolving their asylum claims.   Specifically, Appellants characterized the criminal charges as "a violation of due process because [Appellants] are being deprived of an opportunity to explore and exhaust any administrative remedy they may have with respect to the issue of bond and possible refugee or asylum status."   *Id.* at 9. Appellants further elaborated that the charges were "premature" because, should Appellants "qualify for refugee or asylum status, they cannot be prosecuted for being illegally in this country." *Id.* at 10.

Third, Appellants asserted an additional due process violation based on the conditions surrounding their potential guilty pleas.   *Id.* at 10–13.   Echoing the concerns expressed by the Magistrate Court, Appellants explained that they were "extremely worried about the safety and well-being of their minor children and want to put these § 1325 charges behind them as quickly as possible."   *Id.*   Consequently, given that Appellants' children were being held "in unknown places and under unknown conditions," Appellants asserted that they were being "induce[d] . . . to plead guilty while under duress."   *Id.* at 12.

And fourth, Appellants argued that, taken together, the government's actions implicated the outrageous government conduct doctrine.   *Id.* at 14.   In Appellants' view, the steps taken by

the government—i.e. separating Appellants from their children, prosecuting Appellants instead of allowing them to proceed with their asylum claims, and coercing them to plead guilty by withholding information about the well-being of the children—were so cumulatively egregious that the government forfeited its right to prosecute these cases.  *Id.*

## C.

After Appellants filed their motion to dismiss, the government filed a response.  *See generally* Resp., ECF No. 17.   In its response, the government asserted, inter alia, that the Magistrate Court lacked jurisdiction over issues unrelated to Appellants' criminal prosecution, that there was no basis to dismiss the indictments, that Appellants failed to demonstrate any violation of due process, and that the expressions of federal policy relied on by Appellants are applicable only in the context of civil removal proceedings.  *See generally id.*   The Magistrate Court then held an evidentiary hearing where both sides largely re-urged many of the arguments made in their filings.   That said, Appellants also appeared to raise two additional arguments touching on their right to due process.

First, after reiterating that they should be allowed to pursue their asylum claims prior to any criminal prosecution, Appellants asserted: "So going to trial . . . it's also a violation of due process. Why?   Because we are missing the most important thing, the material witnesses, the children. They don't have them here . . . . So even going to trial would be a violation of due process." Evidentiary Hr'g Tr. at 10, ECF No. 41.

And second, while addressing the government's assertion that separating the children was lawful and consistent with the government's obligations, Appellants argued: "They are using that mechanism to terminate parental rights . . . . Because these clients are going to plead guilty, they are going to be deported, and they are not guaranteeing to keep track of their children . . . . And that

is terminating parental rights."   *Id.* at 13.

In response, the government maintained that Appellants' asylum claims were not relevant to their criminal prosecution, that "pressures related to family concerns" do not render a plea involuntary, that Appellants' remedy for any involuntary plea would be to go to trial rather than dismissal of their indictments, and that "the government doesn't necessarily know" whether the minors were, in fact, Appellants' children.[3]   *Id.* at 15–18, 27.   At the hearing's conclusion, the Magistrate Court denied the motion to dismiss.   *Id.* at 49.

## D.

Several days after the hearing, the Magistrate Court conducted separate bench trials for each Appellant.   The evidence at trial consisted entirely of facts and exhibits stipulated to by both sides.   Stipulated Exs., ECF No. 47.   After the government presented the evidence and rested, Appellants moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. Bench Trial Tr. at 7, ECF No. 49.   In support of the motion, Appellants incorporated by reference all of the arguments previously made in their motion to dismiss and at the evidentiary hearing.   *Id.*

The Magistrate Court denied the motion, and Appellants then proceeded to close.   *Id.* at 8. In closing, Appellants asserted that the children were "key material witnesses," that information as to children's whereabouts was not provided by the government during discovery, and that the children possessed "exculpatory" evidence.   *Id.*   Appellants also argued that by withholding

---

[3] More than a month after these appeals were filed, the government filed a motion with the Magistrate Court to amend the written opinion denying Appellants' motion to dismiss.   In its motion, the government argued that the Magistrate Court's opinion contained several "misstatements of the government's position" concerning the extent to which the government acknowledged the existence of Appellants' parental rights.   The government also reasserted its contention that Appellants' parental rights are irrelevant to their prosecution for improper entry, and that Appellants had failed to offer any evidence substantiating their claims as to the relationship between them and the minor children. The Magistrate Court ultimately denied the government's motion on April 26, 2018, which was after these appeals became fully briefed.   Therefore, the government's contention and the Magistrate Court's ruling on that issue is beyond the scope of these appeals.

information as to the children's whereabouts, the government violated Appellants' right against self-incrimination because it "forces the [Appellants] to take the stand in order to establish their defense."   *Id.*

Afterwards, the government made a brief closing argument, and the Magistrate Court ultimately found Appellants guilty of improper entry.   *Id.* at 12.   Appellants then renewed their Rule 29 motion, which the Court again denied.   *Id.* at 12–13.   A sentencing hearing was held later that afternoon where the Magistrate Court sentenced Appellants to one year of non-reporting probation.   *Id.* at 47–48.

### E.

About one week after the trials, Appellants filed a motion for reconsideration and new trial in which they asserted that their convictions would render them ineligible for relief from deportation.   Mot. to Reconsider at 2, ECF No. 42.   Therefore, while acknowledging that the Magistrate Court sentenced them each to probation, Appellants argued that "the true punishment for their conviction is deportation without their minor children."   *Id.*   Appellants argued further that subjecting them to deportation without their children was a "de facto termination of their parental rights" and "contrary to universal human standards of decency," thus implicating Appellants' rights under the Eighth Amendment.   *Id.* at 3.

In its response, the government made a number of both procedural and substantive arguments.   *See generally* Resp., ECF No. 45.   First, the government explained that a motion for reconsideration cannot be used to raise new arguments that could have been raised before.   *Id.* at 2.   Here, the government argued, Appellants never objected to their punishment at sentencing, and therefore, had waived any argument that it was excessive.   *Id.* at 2–3.   The government also argued that no determination as to Appellants' removal from the country or the termination of their

7

parental rights was made during the criminal proceedings because such determinations are civil in nature. *Id.* at 3–4. And lastly, the government noted that Appellants failed to offer any newly discovered evidence or provide an alternative basis that would support their motion for a new trial. *Id.* at 4.

Agreeing with the government, the Magistrate Court denied Appellants' motion. *See generally* Order, ECF No. 52. The Court explained that Appellants did not provide any new evidence or identify a manifest error of law or fact. *Id.* at 2. The Court additionally declined to consider the merits of any arguments raised for the first time in the motion. *Id.*

## F.

On March 2, 2018, Appellants filed a supplemental memorandum to apprise the Magistrate Court of recent developments concerning their civil removal proceedings. *See generally* Suppl. Mem., ECF No. 65. Appellants explained in the memorandum that Immigration and Customs Enforcement ("ICE") removed four of them to their home countries between January and February. *Id.* at 2. In the case of Appellant Vazquez-Hernandez, an immigration judge granted her an immigration bond on February 21, 2018. *Id.*

## II.

Appellants were charged with improper entry, which carries a maximum penalty of six months imprisonment for first time offenders. *See* 8 § U.S.C 1325(a). Accordingly, the Magistrate Court had jurisdiction over Appellants' criminal cases. *See* 18 U.S.C. §§ 3401(a), 3559(a)(7); *see also* Local Court Rule CR-58(a). Further, "[i]n all cases of conviction by a United States magistrate judge an appeal of right shall lie from the judgment of the magistrate judge to a judge of the district court of the district in which the offense was committed." 18 U.S.C. § 3402. Therefore, this Court has jurisdiction over these appeals. *See id.* In cases where the District

Court reviews a judgment from the Magistrate Court, "[t]he scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge."   Fed. R. Crim. P. 58(g)(2)(D).

## III.

In their brief, Appellants argue that their constitutional rights were violated, necessitating reversal of their convictions and sentences.   That said, they do not ground their challenges in any particular ruling made by the Magistrate Court, nor do they specify when or how the Magistrate Court erred.   For example, Appellants do not argue that the Magistrate Court erroneously denied their motion to dismiss, motion for judgment of acquittal, or motion for reconsideration and new trial.   Similarly, Appellants' attack neither the Magistrate Court's reasoning in ruling on those motions nor the sufficiency of the evidence presented at trial.   Instead, Appellants simply raise the same challenges they made in the motions, albeit in a somewhat more refined fashion.

Specifically, they assert: (1) that their right to a fair trial was violated by their inability to voluntarily plead guilty and by the government's failure to produce material witnesses in support of a duress defense; (2) that the government impermissibly placed a penalty on their right against self-incrimination; (3) that the conditions of their pretrial detention constituted a punishment; (4) that their sentences were cruel and unusual under the Eighth Amendment; (5) that the government committed a *Brady* violation; and (6) that the steps taken by the government in prosecuting these cases implicates the outrageous government conduct doctrine.   Generally, constitutional claims such as these are reviewed de novo.   *United States v. Romero-Cruz*, 201 F.3d 374, 377 (5th Cir. 2000).

The government argues, however, that Appellants failed to sufficiently preserve their claims as to the duress defense, *Brady* violation, and right against self-incrimination.   The

9

government thus urges the Court to review these issues only for plain error.   *See United States v. Preciado-Delacruz*, 801 F.3d 508, 511 (5th Cir. 2015).   Appellants disagree, contending that they adequately raised these issues during oral argument at the evidentiary hearing and at their closings during trial.   The Court need not resolve the issue.   Instead, the Court reviews Appellants' claims de novo because, as explained below, Appellants' claims are unavailing even under a more lenient standard.[4]

## IV.

### A.

The Court first takes up Appellants' argument that they were deprived of their right to a fair trial.   Appellants advance two separate bases.   First, they argue that being separated from their minor children rendered them unable to enter a voluntary guilty plea.   Appellants' Br. at 8–9, ECF No. 11.   And second, they argue that they were refused the opportunity to present witnesses who would have offered testimony that was material to their defense.   *Id.* at 10–13.

### 1.

Appellants' argument on appeal concerning their inability to enter a voluntary guilty plea mirrors the argument made in their motion to dismiss; in essence, they argue that their right to due process was violated because they could not enter a voluntary plea given their understandable anxiety as to the well-being of their children.

Appellants are correct that an involuntary plea offends due process.   *E.g.*, *Boykin v.*

---

[4] The Court notes that the government does not include Appellants' Eighth Amendment argument among the issues it believes were inadequately preserved on appeal.   The government did, on the other hand, argue in its response to the motion for reconsideration and new trial that Appellants waived the issue by failing to object at the sentencing hearing.   While the Fifth Circuit has held that "a defendant's failure to object at sentencing to the reasonableness of his sentence triggers plain error review," the Court nonetheless addresses Appellants' Eighth Amendment argument de novo for the same reason it addresses de novo Appellants' other arguments that the government believes are subject to plain-error review.   *See United States v. Ross*, 582 F. App'x 528, 529 (5th Cir. 2014) (citing *United States v. Peltier*, 505 F.3d 389, 391–92 (5th Cir. 2007)).

*Alabama*, 395 U.S. 238, 242 (1969).   Generally speaking, a plea is involuntary if "the accused does not understand the nature of the constitutional protections that he is waiving, or because he has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt."   *Henderson v. Morgan*, 426 U.S. 637, 645 n.13 (1976) (citation omitted).   A plea is also involuntary when it has been procured through threats of physical harm, mental coercion, or "state-induced emotions so intense that the defendant was rendered unable to weigh rationally his options with the help of counsel."   *Matthew v. Johnson*, 201 F.3d 353, 365 (5th Cir. 2000).

The requirement that a plea be voluntary is rooted in three different constitutional rights. *See Boykin*, 395 U.S. at 243.   By pleading guilty, a criminal defendant waives his right against self-incrimination, *id.* (citing *Malloy v. Hogan*, 378 U.S. 1 (1964)), his right to go to trial, *id.* (citing *Duncan v. Louisiana*, 392 U.S. 947 (1968)), and his right to confront his accusers, *id.* (citing *Pointer v. Texas*, 380 U.S. 400 (1965)).   Thus, "a plea of guilty is more than an admission of conduct; it is a conviction."   *Id.* at 242.

Implicit in Appellants' argument is that they have a right to enter a guilty plea.   No authority cited by Appellants supports that proposition.   In *Weatherford v. Bursey*, 429 U.S. 545 (1977), the Supreme Court observed: "It is a novel argument that constitutional rights are infringed by trying the defendant rather than accepting his plea of guilty."   *Id.* at 561.   Other courts have relied on that observation to conclude that a criminal defendant has no right to plead guilty. *Simmons v. Warren*, No. 2:13-CV-12531, 2014 WL 902848, at *3 (E.D. Mich. Mar. 7, 2014); *Visconti v. United States*, 454 F. Supp. 417, 418 (D. Mass. 1978); *accord United States v. Alvarado-Arriola*, 742 F.2d 1143, 1144 (9th Cir. 1984) ("Appellant had no right to plead guilty to the misdemeanors charged in the complaint; he had only a right to offer to make such a plea and to

have the court, in its discretion, determine its propriety.").    Appellants do not argue to the contrary.

Furthermore, the constitutional rights guarded by the voluntary-plea requirement were not violated in the proceedings below.   Rather, Appellants exercised each of them.   The Magistrate Court held five separate bench trials.   At those trials, Appellants were not compelled to testify against themselves, and they had the opportunity to confront the evidence against them. Therefore, it would be counter-intuitive to conclude that Appellants were deprived of their right to a fair trial based on their inability to enter a voluntary plea when they were able to exercise each of the rights guarded by the voluntary-plea requirement, and Appellants do not otherwise specify how their trials were affected.   Further, "a defendant has no right to be offered a plea."   *See Missouri v. Frye*, 566 U.S. 134, 148 (2012).   Consequently, to the extent Appellants assert that their inability to accept the government's plea agreement was a due process violation, that argument lacks merit.

In sum, the Magistrate Court did not err in its disposition of this issue.   Without an actual plea to evaluate or any basis in the record indicating that Appellants were deprived of their right to a fair trial, the Court cannot find a due process violation on the ground advanced by Appellants.[5]

**2.**

Appellants' second argument as to why they were deprived of a fair trial relates to their assertion that they were refused the opportunity to call their children as material witnesses.   At the evidentiary hearing on their motion to dismiss, Appellants explained to the Magistrate Court that the children were missing material witnesses.   Evidentiary Hr'g Tr. at 10.   Appellants then

---

[5] For the same reasons, the Court need not address the parties' arguments nor the Magistrate Court's interpretation concerning the immigration consequences of a guilty plea as discussed by the Supreme Court in *Padilla v. Kentucky* 559 U.S. 356 (2010).

expanded on that argument in their closing arguments during the bench trials, specifying that the children were "exculpatory regarding the Defendants [sic] well-founded fear for leaving their countries." Bench Trial Tr. at 8. Appellants further refined this argument on appeal. In their brief, Appellants now argue that the children were material to establishing a duress defense. Appellants' Br. at 10–13.

The government may violate both the Fifth and Sixth Amendment when it prevents a defense witness from offering testimony. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982). This is so because the Due Process Clause of the Fifth Amendment guarantees an opportunity to put on an effective defense, and the Compulsory Process Clause of the Sixth Amendment guarantees a right to compel witness testimony. U.S. Const. amend. VI; *see California v. Trombetta*, 467 U.S. 479, 486 (1984); *Valenzuela-Bernal*, 458 U.S. at 873. The Supreme Court explained in *Washington v. Texas*, 388 U.S. 14 (1967):

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Id.* at 23. Because Appellants frame their challenge as a violation of due process, the Court focuses on whether the absence of the children's testimony deprived Appellants of their opportunity to present an effective defense. There are several contexts where the government's treatment of a defense witness may constitute a due process violation.

For example, the government violates a defendant's right to due process when it threatens or intimidates a witness into refusing to testify. *See United States v. Hammond*, 598 F.2d 1008, 1012 (5th Cir. 1979); *United States v. Henricksen*, 564 F.2d 197, 198 (5th Cir. 1977). The

13

government likewise commits a due process violation when it hides witnesses or conceals their whereabouts.  *Hernandez v. Estelle*, 674 F.2d 313, 315 (5th Cir. 1981); *Lockett v. Blackburn,* 571 F.2d 309, 314 (5th Cir. 1978).   The same is true when the government deports witnesses without considering the exculpatory value of their testimony or allowing the defendant an opportunity to interview them.  *See United States v. Villanueva*, 408 F.3d 193, 200 (5th Cir. 2005); *United States v. Hernandez*, 347 F. Supp. 2d 375, 386 (S.D. Tex. 2004).

Unsurprisingly, the applicable framework differs in these lines of cases.   To show witness intimidation, the defendant must establish that the government used improper tactics to coerce a witness into refusing to testify.  *See United States v. Girod*, 646 F.3d 304, 312 (5th Cir. 2011) ("Presenting the potential defense witnesses with the facts of the investigation and the crimes charged does not amount to witness intimidation; there must be evidence of threats or intimidation.").   That framework is necessarily less applicable when the government hides or deports witnesses because, in those cases, the witness's unavailability is not premised on intimidation.  *See Villanueva*, 408 F.3d at 200.   Another difference concerns the available remedies.   Unlike witness intimidation, which usually results in remand for a new trial, deportation of a material witness may warrant dismissal of the indictment.  *Compare Henricksen*, 564 F.2d at 198, *with Hernandez*, 347 F. Supp. 2d at 389.

Setting aside any differences, however, there is a salient commonality in these cases; to establish a due process violation, the defendant must demonstrate that the witness's testimony is material.   Indeed, when witnesses are deported, the defendant must offer "some explanation of how their testimony would have been favorable and material."   *Valenzuela-Bernal*, 458 U.S. at 872.   Likewise, in the intimidation cases, the defendant must show "that a prospective witness was intimidated or that he refused to testify," or that the "testimony would have contained . . .

14

material exculpatory evidence." *United States v. Viera*, 839 F.2d 1113, 1115 (5th Cir. 1988). While the facts underlying this appeal do not fit neatly into one of the categories of cases discussed above, it is nevertheless clear that Appellants must show materiality to establish a due process violation.

In formulating the materiality requirement in *Valenzuela-Bernal*, the Supreme Court canvased prior decisions relating to "what might loosely be called the area of constitutionally guaranteed access to evidence." 458 U.S. at 867. Looking to *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, the Court explained "that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *Valenzuela-Bernal*, 458 U.S. at 868 (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)). The Court ultimately held that "sanctions will be warranted for deportation of alien witnesses only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Id.* at 873–74.

Thus, it is clear that materiality turns on whether the evidence could have affected the outcome of the trial. Following *Valenzuela-Bernal*, the Court explained that in the context of a *Brady* violation, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In addition, the Court invoked *Valenzuela-Bernal's* materiality requirement in defining the prejudice prong for ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). To demonstrate prejudice by deficient counsel, a criminal defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* Therefore, the children's testimony is material only if there is a reasonable

15

probability that the outcome of the Appellants' trials would have been different had the children testified.   *See Bagley*, 473 U.S. at 682.

Appellants argue that the children were material witnesses because they could have helped to establish the affirmative defense of duress.   In support, Appellants point to their "well-founded fear claims" and assert that the children's testimony would have corroborated those claims such that Appellants could have demonstrated that they were under duress when they illegally entered the United States.   Appellants' Br. at 10–11.   Duress requires the defendant to show (1) that he was under an unlawful, present, imminent, and impending threat that would induce "a well-grounded apprehension of death or serious bodily injury," (2) that he had not recklessly or negligently placed himself in the situation at issue, (3) that he had no legal and reasonable alternative to violating the law, and (4) that it was reasonable to anticipate that the avoidance of harm directly caused the criminal action.   *United States v. Posada-Rios*, 158 F.3d 832, 873 (5th Cir. 1998).

Because the absence of any one element precludes a defendant from mounting a duress defense, the Court focuses on elements one and three.   As to the first element's requirement that the threat be imminent, "[f]ear of future harm" is insufficient.   *United States v. Ramirez-Chavez*, 596 F. App'x 290, 293 (5th Cir. 2015) (citing *United States v. Harvey*, 897 F.2d 1300, 1305 (5th Cir. 1990)).   Rather, a defendant must show that there was "a real emergency leaving no time to pursue any legal alternative."   *Posada-Rios*, 158 F.3d at 874.   In other words, there must be evidence that the defendant was in imminent danger "at the moment he [committed the offense]." *United States v. Harper*, 802 F.2d 115, 118 (5th Cir. 1986).   Concerning the third element, "[a] reasonable legal alternative exists if a defendant has 'a chance both to refuse to do the criminal act and also to avoid the threatened harm.'"   *Ramirez-Chavez*, 596 F. App'x at 293 (quoting *United*

16

*States v. Posada-Rios*, 158 F.3d 832, 873 (5th Cir. 1998)).   To demonstrate that no legal

alternative existed, a defendant must present evidence "that he had actually tried the alternative or

had no time to try it, or that a history of futile attempts revealed the illusionary benefits of the

alternative."   *Harper*, 802 F.2d at 118.

Appellants have not demonstrated that there is a reasonable probability that the outcome of

the bench trials would have been different had the children testified in support of a duress defense.

Improper entry requires only that the government prove (1) the defendant was an alien (2) who

entered or attempted to enter the United States (3) at a time or place other than as designated by

immigration officers.   8 U.S.C. § 1325(a).   Therefore, to successfully assert a duress defense, an

alien charged with improper entry must show that an imminent threat essentially caused him or her

to cross into the United States at an undesignated time or place.   *See Posada-Rios*, 158 F.3d at

873.   But Appellants offer little more than a recitation of the elements for duress and an assurance

that those elements would have been fulfilled had the children testified.   *See* Appellants' Br. at 12.

Appellants provide no facts or explanation as to how the testimony of the children would show that

they faced an imminent threat at the time they entered the United States.   Rather, by relying on

their "well-founded fear claims," they undercut their duress defense because those claims are

rooted in the danger they faced in their home countries, not at the time of crossing the border into

the United States.   Nothing suggests that those dangers followed them to the border.   Similarly,

there is no basis to believe that Appellants did not have a reasonable legal alternative to crossing

the border into the United States at an undesignated place.   As the government argued here,

Appellants could have simply gone to a legal entry point at the border to enter the country.   *See*

*Ramirez-Chavez*, 596 F. App'x at 293 (agreeing that a reasonable legal alternative to illegal

reentry existed when the defendant could have gone to a designated entry point).[6]

The Court is mindful that Appellants face a difficult task in demonstrating a reasonable probability that the outcome would have been different given that counsel never had the opportunity the interview the children.   In *Valenzuela-Bernal*, the Supreme Court recognized this concern and explained that "the defendant cannot be expected to render a detailed description of [the] lost testimony."   458 U.S. at 873.   Nevertheless, the Court held that there must be "a plausible showing" as to materiality.   *Id.*   Here, Appellants have not made any showing.   As set out above, their arguments are devoid of detail and are largely conclusory.   That does not suffice to show materiality.   *See United States v. Edwards*, 442 F.3d 258, 268 n.10 (5th Cir. 2006) (rejecting a *Brady* claim where the appellant offered only "speculative and conclusory allegations" as to the materiality prong).

## B.

Appellants' second argument is that their right against self-incrimination was violated. Appellants assert that the government "orchestrated a situation where [Appellants] would have to testify against themselves at trial."   Appellants' Br. at 14.   The crux of this assertion is that the government separated Appellants from their children, knowing that the children were material witnesses.   Therefore, in Appellants' view, they had no choice but to plead guilty or go to trial and testify against themselves, which "placed a penalty on [Appellants'] self-incrimination privilege." *Id.*

---

[6] There are reports that CBP agents are preventing immigrants from presenting themselves to immigration agents at appropriate border crossing checkpoints in order to stop them from seeking asylum.   Robert Moore, *Border Agents Are Using a New Weapon Against Asylum Seekers*, Texas Monthly (June 2, 2018), https://www.texasmonthly. com/politics/immigrant-advocates-question-legality-of-latest-federal-tactics/.   Appellants have not made such an argument to the Court nor presented any evidence that Appellants had reason to believe that CBP agents would prevent them from presenting themselves at the border to United States agents.   The Court does not consider this troubling possibility further.

Appellants rely on the Supreme Court's "penalty cases" in support of this argument.   In those cases "the state not only compelled an individual to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions."   *Minnesota v. Murphy*, 465 U.S. 420 (1984).   For example, when the state of New York threatened to disbar an attorney for refusing to testify in his disciplinary proceeding, the Court reasoned that the resultant "loss of professional standing, professional reputation, and of livelihood" was an impermissible penalty on the right against self-incrimination.   *Spevack v. Klein*, 385 U.S. 514–15 (1967).   A common thread in these cases is a "nexus between remaining silent and the consequences that follow."   *McKune v. Lile*, 536 U.S. 24, 44 (2002).   Put another way, they "involve situations where, if a defendant took no action that would incriminate himself, the government would exact or increase punishment."   *United States v. Mourning*, 914 F.2d 699, 707 (5th Cir. 1990).

That nexus is not present here.   The government did not separate Appellants from their children because Appellants refused to waive their right against self-incrimination.   Nor did the government offer to reunite Appellants with their children in exchange for waiving that right. Rather, the record shows that CBP transferred custody of the children to ORR pursuant to 8 U.S.C. § 1232, and Appellants offer nothing to the contrary.   Furthermore, Appellants' assertion that the government did not make "the minor children available for any of the proceedings, including trial, knowing that . . . the children were the only witnesses who could corroborate credible fear claims" is not borne out by the record.   *See* Appellants' Br. at 14.   Appellants first asserted that the children were "material witnesses" at the evidentiary hearing on their motion to dismiss, and the bench trials took place just four days later.   Appellants do not argue, and nothing in the record suggests, that they made demands that the government produce the children which the government

rebuffed in an effort to force Appellants to testify.   Accordingly, Appellants fail to show that the government placed a penalty on them for exercising their right against self-incrimination, and there is no discernable error by the court below on this issue.

## C.

The Court next takes up Appellants' claim that their pretrial detention and separation from their children is an unconstitutional punishment.   The core of Appellants' argument on this point is largely unchanged from the motion to dismiss.   Appellants point to a constellation of statements from federal governmental sources that express a policy of allowing family members to remain unseparated as they navigate immigration-related proceedings.   *Id.* at 15–22.   Appellants then argue that the government's failure to abide by that policy amounts to a punishment in violation of their right to due process.   *Id.*

The sources upon which Appellants rely are numerous.   Most prominent is the Flores Settlement, which was agreed to by Immigration and Naturalization Services ("INS") in the late 1990s.   *See* Flores Settlement, ECF No. 17 Ex. A.   The Flores Settlement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS and . . . supersede[s] all previous INS policies that are inconsistent with the terms of this Agreement."   *Id.* ¶ 9.   It is binding on successor agencies, including the Department of Homeland Security ("DHS").   *See id.* ¶ 1.   Its provisions were "intended as a stopgap measure until the United States could promulgate reasonable, binding standards for the detention of minor[s] in immigration custody."   *Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *2 (W.D. Tex. Apr. 9, 2007).   Those standards remain unrealized, and the government does not dispute that the Settlement is still in effect today.

On the whole, the Flores Settlement expresses "a policy preference for the release of

minors where possible, and sets out standards for the conditions of detention where release is not available."   *Id.*   Once the government determines that detention of a minor is unnecessary to secure his or her timely appearance in immigration court or to protect the public safety, the government "shall release the minor from its custody without unnecessary delay" to: a parent, a legal guardian, an adult relative, an adult designated by the minor's parents or guardian as capable and willing to care for the minor's well-being, a licensed program, or, in the government's discretion, to an adult individual or entity seeking custody.   Flores Settlement ¶ 14.   Notably, however, the Settlement "does not provide any particular rights or remedies for adult detainees," and "nothing in the . . . agreement expresses a preference for releasing parents who have violated immigration laws."   *Bunikyte*, 2007 WL 1074070, at *16.

Appellants also rely on an ICE policy statement entitled "Parental Interests Directive." The directive explains that "ICE personnel should ensure that the agency's immigration enforcement activities do not unnecessarily disrupt the parental rights of both alien parents or legal guardians of minor children."   Appellants' Br. at 16.   The directive goes on to state that it "may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter."[7]   Gov. Br. at 43, ECF No. 15.

In addition, Appellants point to legislative history that summarizes bill reports accompanying legislation that provided funding for DHS in 2006 and 2007.   One report

---

[7] Appellants and the government both provide the same hyperlink to ICE's website in citing to the Parental Interests Directive.   Although the Court previously reviewed the document by using the link provided by the parties, curiously, that link is no longer functional.   The Policy Number associated with the Parental Interests Directive is 11064.1.   On August 29, 2017, ICE promulgated a policy entitled "Detention and Removal of Alien Parents or Legal Guardians."   This new policy is numbered 11064.2, and it purports to supersede ICE policy 11064.1.   *See* Detention and Removal of Alien Parents or Legal Guardians, ICE, https://www.ice.gov/doclib/detention-reform/pdf/directive DetainedParents.pdf.   It is unclear why the previous policy was still available on ICE's website months after it was apparently superseded.   More unclear is why the government never pointed out that Appellants were relying on an outdated policy.   In any event, the outcome of this appeal does not turn on the validity of the Parental Interests Directive.

"expresse[d] deep concern about reports [of] children . . . being separated from their parents and placed in shelters operated by the Department of Health and Human Services while parents are held in separate jail-like facilities."   Department of Homeland Security Appropriation Act 2006, 151 Cong. Rec. E1025-01, 2005 WL 1185446.   The report went on to direct DHS to "release families or use alternatives to detention whenever possible."   *Id.*   The second bill report expressed similar concerns and "encourage[d] ICE to house family members together in nonpenal, home-like environments until the conclusion of their immigration proceedings."   Department of Homeland Security Appropriation Act 2007, 152 Cong. Rec. E1113-02, 2006 WL 1594390.

And finally, Appellants invoke Supreme Court precedent discussing parental rights, as well as an immigration statute that ensures aliens who claim asylum receive an interview with an asylum officer.   Appellants rely on *Stanley v. Illinois*, 405 U.S. 645 (1972), which held unconstitutional a state law requiring that the children of unwed fathers become wards of the state upon the death of the mother without first conducting a hearing on the father's parental fitness. *Id.* at 646.   There, the Court reiterated the importance of parental rights, referring to them as one of the "basic civil rights of man."   *Id.* at 651.   As to the immigration statute cited by Appellants, it provides that, if an arriving alien requests asylum or indicates a fear of persecution, an immigration officer "shall refer the alien for an interview by an asylum officer."   *See* 8 U.S.C. § 1225(b)(1)(A)(ii).

There are several problems with these materials as they relate to Appellants' argument on appeal.   Most significantly, none of them speak to the rights of adult parents in the midst of a criminal proceeding.   Although the statute cited by Appellants appears to create a right to meet with an asylum officer, the statute is silent on whether an alien can first be prosecuted for immigration offenses.   *See id.*   In evaluating a regulatory provision with an identical

requirement, the Fifth Circuit explained that even if the government violated the provision by failing to allow the asylum interview, "such a violation has no relevance to the prosecution for illegal reentry." *United States v. Brizuela*, 605 F. App'x 464, 465 (5th Cir. 2015); *accord United States v. Reyes-Salgado*, 13 F. App'x 705, 706 (9th Cir. 2001) (finding no due process violation where the government prosecuted a defendant for illegal entry before granting him an asylum hearing); *see also United States v. Polanco-Gomez*, 841 F.2d 235, 238 (8th Cir. 1988) ("A criminal trial for the felony of illegal reentry after deportation, however, is not the proper forum to argue a case for political asylum.").

Furthermore, while the Court agrees that these materials articulate an unequivocal preference against separating families, that is all they appear to amount to—a policy preference. The ICE directive, by its own terms, does not create any enforceable rights.   Likewise, the remarks in the legislative history merely express concerns and encourage DHS to refrain from separating families when possible.   Although the Flores Settlement is legally binding, as discussed above, the rights created under the agreement are applicable only to minors, and none of its provisions suggest that minors should be released to an adult who has been charged with, and is being detained for, an immigration offense.   *See Bunikyte*, 2007 WL 1074070, at *16.   In short, nothing in these materials requires that the government cease or suspend Appellants' criminal prosecution, reunite them with their children, and allow them to press forward with their asylum claims.

How these materials support Appellants' argument that their pretrial detention amounts to a punishment in violation of their right to due process is not readily apparent.   More importantly, Appellants do not cite, and the Court has not found, any authority supporting dismissal of a criminal indictment under these circumstances.   At bottom, Appellants' real claim is that their

conditions of confinement are unconstitutional and that the government is abusing its prosecutorial discretion.   Appellants take issue with their inability to communicate with their children while their criminal proceedings were pending, and with the government's decision to prosecute them for improper entry instead of allowing them to pursue their asylum claims.   While these concerns of course merit thoughtful attention and consideration, they are the subject matter of a civil action, not a misdemeanor criminal case.   *See Suggs v. Brannon*, 804 F.2d 274, 279 (4th Cir. 1986) (noting that "pretrial detention issues cannot be raised in defense of a criminal prosecution"); *see also United States v. Salinas*, No. CR. C-07-357, 2009 WL 593941, at *2 (S.D. Tex. Mar. 4, 2009) ("To the extent he is seeking to raise a claim challenging his current conditions of confinement or a claim that his civil rights have been violated, such claims should be asserted in a civil complaint."); *cf. Dupont v. Linden*, 81 F.3d 155 (5th Cir. 1996) ("Allegations of malicious prosecution in a criminal case are actionable under § 1983.").   Accordingly, the Magistrate Court did not err in its disposition of this issue.

### D.

Appellants' next argument is that their sentences for misdemeanor improper entry are cruel and unusual in violation of the Eighth Amendment.   Appellants contend that the true punishment of their crime is not one year of non-reporting probation but rather deportation to their home countries and the de facto termination of their parental rights.   Appellants' Br. at 25–26. Appellants' parental rights were terminated, in their view, because "[n]othing indicates that they left for their Central American countries in the company of their children" and "there is no guarantee to be reunited with them."   *Id.* at 25.

The Court notes that some of Appellants' arguments on this point are difficult to square with the record.   Although Appellants assert that the Magistrate Court entered a "written

judgment of guilt and deportation," that is simply not true.   *See* Reply Br. at 15, ECF No. 16. The judgments entered after Appellants' trials say nothing of deportation, nor could they.   *See* Judgment and Commitment, ECF No. 44.   This is because "[d]eportation, however severe its consequences, has been consistently classified as a civil rather than a criminal procedure." *Harisiades v. Shaughnessy*, 342 U.S. 580, 593 (1951).   The Magistrate Court did not sentence Appellants to deportation.   Rather, as Appellants implicitly acknowledge in their supplemental memorandum, they were removed only at the conclusion of separate removal proceedings before the immigration court.   And, to the extent Appellants suggest that their removal orders were cruel and unusual, that argument is foreclosed; it is well-established that the Eighth Amendment does not apply to removal proceedings.   *See Reyes-Gomez v. Gonzales*, 163 F. App'x 293, 295 (5th Cir. 2006) (citing *Cortez v. Immigration & Naturalization Serv.*, 395 F.2d 965, 968 (5th Cir. 1968)).

Moreover, Appellants' parental rights were not terminated.   A termination of parental rights "extinguish[es] the parent-child relationship."   *Santosky v. Kramer*, 455 U.S. 745, 747 (1982).   Afterwards, the parent no longer has a right of custody or care over the child.   *See Stanley*, 405 U.S. at 652.   Similar to removal, these rights can be terminated only through a civil proceeding.   *See Santosky*, 455 U.S. at 747–48 ("Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence.").   Consequently, it is clear that Appellants' criminal convictions did not terminate their parental rights.   That is not to say, however, that the actions taken by the government did not at all interfere with Appellants' rights.   Indeed, any time the government detains or imprisons a parent for criminal activity, that parent's rights as to her children are implicated.   *Cf. Aguilar v. U.S. Immigration & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 22 (1st Cir. 2007) ("That a detention has an impact on the

25

cohesiveness of a family unit is an inevitable concomitant of the deprivation of liberty inherent in the detention itself.").   But if that kind of interference were actionable under the Eighth Amendment, every imprisoned parent would arguably have a claim.   That is not the state of the law.

Finally, as to Appellants' arguments concerning the uncertainty of whether they will be reunited with their children, the Court understands Appellants' frustration and anxiety.   To be unexpectedly separated and held incommunicado from a child for an indefinite period of time is an ordeal no parent would willingly endure.   Still, in the conditions-of-confinement context, courts have found that this type of incidental separation does not amount to a violation of the Eighth Amendment.   *See Lindsay v. Mitchell*, 455 F.2d 917, 918 (5th Cir. 1972) (concluding that transfer of an inmate to another prison where his family cannot visit does not constitute cruel and unusual punishment); *Simmons v. Wolff*, 594 F. Supp. 2d 6, 9 (D.D.C. 2009) ("Deprivations such as infrequent or no visits from family . . . simply do not meet the threshold of 'extreme deprivations' required to state an Eighth Amendment claim regarding conditions of prison confinement."). Moreover, Appellants offer no authority suggesting that a criminal conviction may be vacated on the basis of an Eighth Amendment violation.   Thus, there was no error in the proceedings below on this issue.

### E.

Appellants' fifth argument is that the government committed a *Brady* violation.   This argument is essentially a variation on Appellants' assertion that they were deprived of their right to a fair trial because their children were material witnesses whom the government made unavailable. Appellants argue that the government suppressed evidence in that the whereabouts of Appellants' children were not disclosed during discovery.   Appellants' Br. at 26–27.   Appellants argue

further that the children's testimony was exculpatory and material because it would have supported their duress defense. *Id.* at 30. Appellants also argue, in the alternative, that even if the children's testimony would have been only potentially useful rather than exculpatory, the government acted in bad faith, implicating *Arizona v. Youngblood*, 488 U.S. 51 (1988). *Id.* at 36–37.

## 1.

To establish a *Brady* violation, a defendant must show that: (1) favorable evidence (2) was suppressed by the prosecution (3) that was material to guilt or punishment. *Pippin v. Dretke*, 434 F.3d 782, 789 (5th Cir. 2005). The prosecution has an affirmative duty to disclose favorable evidence "even though there has been no request by the accused." *Strickler v. Greene*, 527 U.S. 263, 280 (1999). Favorable evidence includes both exculpatory and impeachment evidence. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Evidence that tends to support an affirmative defense is also considered favorable. *United States v. Cessa*, 861 F.3d 121, 131 (5th Cir. 2017).

Nevertheless, there is no suppression when "the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *West v. Johnson*, 92 F.3d 1385, 1399 (5th Cir. 1996). The prosecution "bears no responsibility to direct the defense toward potentially exculpatory evidence that is either known to the defendant or that could be discovered through the exercise of reasonable diligence." *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) (footnote omitted). Rather, "*Brady* claims involve the discovery after trial of information which had been known to the prosecution but unknown to the defense." *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994) (internal quotation marks omitted).

Furthermore, even where favorable evidence is suppressed, a defendant must demonstrate that the evidence is material before relief will be granted. *Kyles*, 514 U.S. at 432. Of the three

*Brady* elements, "materiality is generally the most difficult to prove."   *Mahler v. Kaylo*, 537 F.3d

494, 500 (5th Cir. 2008).   "[E]vidence is material only if there is a reasonable probability that, had

the evidence been disclosed to the defense, the result of the proceeding would have been

different."   *See Bagley*, 473 U.S. at 682.   A reasonable probability arises when "the favorable

evidence could reasonably be taken to put the whole case in such a different light as to undermine

confidence in the verdict."   *Kyles*, 514 U.S. at 435.

        With regard to Appellants' argument that the government withheld material evidence in

violation of *Brady* in that the testimony of the children would have supported a duress defense, the

issue is resolved by the Court's previous analysis on materiality.   *See supra* Section IV(A)(2).

As discussed above, a conviction for improper entry turns on whether an alien entered into the

United States at an undesignated place or time.   *See* 8 U.S.C. § 1325.   Therefore, to successfully

assert a duress defense, Appellants must show that an imminent threat—existing at the time they

entered—forced their improper entry.   *See Harper*, 802 F.2d at 118; *see also Ramirez-Chavez*,

596 F. App'x at 293–94 (concluding that an imminent threat did not exist when the defendant

crossed into the United States after escaping from a house near the border at which he was tortured

because his captors were not in hot pursuit).   Appellants do not offer any evidence that speaks to

this requirement.   Instead, Appellants' allegations of duress stem from the dangers they faced in

their home countries rather than any danger that existed when they made their entry into the United

States.   Moreover, Appellants do not explain why simply crossing at a designated port of entry

was not a reasonable legal alternative to improper entry.   *See Ramirez-Chavez*, 596 F. App'x at

294.   The Magistrate Court therefore did not err as to the substance of Appellants' *Brady* claim.

        Although that finding is sufficient, the Court notes that there is a serious question as to

whether Appellants have demonstrated that the government suppressed any evidence.   In *United*

*States v. Lanford*, 838 F.2d 1351 (5th Cir. 1988), the defendant argued that the government committed a *Brady* violation because it did not disclose the name or location of individuals who witnessed the events leading up to his arrest.   *Id.* at 1355.   The court flatly rejected the defendant's argument, reasoning that there was no suppression because the defendant was "fully . . . aware of these 'witnesses' (though not their names or how to reach them) and what they might have observed."   *Id.*   Even with that knowledge, however, the defendant "never requested any information about them from the government."   *Id.*   Similarly, in *Lawrence*, 42 F.3d 255, the defendant did not learn about documentary evidence tending to impeach one of the government's witnesses until the middle of trial.   *Id.* at 257.   In concluding that there was no suppression, the court noted that the defendant "could have moved for a recess or continuance in order to prepare his impeachment of the victim."   *Id.* at 258 (citing *United States v. Kelly*, 14 F.3d 1169, 1176 (7th Cir. 1994)).

Here, as with the alleged witnesses in *Lanford*, Appellants obviously knew that the children existed.   *See* 838 F.2d 1355.   Further, given that their duress defense is premised on conditions in their home countries, Appellants were aware of the facts that would have formed the basis of the children's testimony.   *See id.*   And yet, similar to the defendant in *Lanford*, there is no indication in the record that Appellants made an effort to call the children as witnesses.   *See id.* Nothing suggests that Appellants requested that the children be made available so they could be interviewed by counsel, and there is no evidence that Appellants attempted to subpoena them. Instead, Appellants argued for the first time at trial that the government failed to disclose the children's whereabouts during discovery.   In doing so, Appellants did not request a recess, continuance, or other relief that would have allowed them to prepare a defense based on the children's testimony.   *See Lawrence*, 42 F.3d at 258.   Consequently, with so little in the record to

indicate that Appellants exercised diligence to secure the children as witnesses based on facts that were known to them, whether the government suppressed any evidence is far from clear. *See* W*est*, 92 F.3d at 1399; *see also Anderson v. Kelly*, No. CV 91-1354 (DRH), 1992 WL 175665, at *3 (E.D.N.Y. July 14, 1992) (holding that the prosecution's *Brady* obligation is not implicated when the defense is aware of a witness's identity (citing *United States v. Robinson*, 560 F.2d 507, 518 (2d Cir. 1977))).

## 2.

The Court next turns to Appellants' argument based on *Arizona v. Youngblood*, 488 U.S. 51 (1988).   Appellants argue that if the children's testimony is insufficiently material to trigger *Brady*, it is at least "potentially useful" such that the *Youngblood* framework is applicable. Appellants' Br. at 36–37.   *Youngblood* belongs to a line of cases that imposes a duty similar to but separate from *Brady*.   Whereas *Brady* requires the government to disclose favorable evidence that is material to guilt or punishment, the *Youngblood* line of cases addresses the extent to which the government must preserve potentially exculpatory evidence on behalf of criminal defendants.

In *Youngblood*, the Court considered whether the State committed a constitutional violation when it failed to properly preserve semen samples taken from a rape victim.   488 U.S. at 52–54.   Because the samples were not correctly preserved, the State's tests yielded inconclusive results regarding the perpetrator's identity.   *Id.* at 54.   The defendant asserted that, had the State properly preserved the samples, conclusive testing would have shown that he was innocent.   *Id.* On appeal, the Court characterized the samples as "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."   *Id.* at 57.   The Court went on to hold that such evidence is merely "potentially useful," and that the destruction of potentially useful evidence amounts to a constitutional

30

violation only if the defendant can demonstrate bad faith on the part of the State.  *Id.* at 58.   A requirement of bad faith, the Court explained, would limit violations to cases where the government "by [its] conduct indicate[s] that the evidence could form a basis for exonerating the defendant."  *Id.*

Thus, the *Youngblood* line of cases involves evidence that is permanently "lost, destroyed, or otherwise unavailable."  *See Magraw v. Roden*, 743 F.3d 1, 7–8 (1st Cir. 2014).   Because evidence in this context is permanently lost, its "exculpatory value therefore [is] speculative and unknown."  *Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1087 (9th Cir. 2009) (differentiating *Youngblood* from *Brady* and addressing allegations that the prosecution failed to disclose materials within its possession).   At bottom, the concern in these cases can be fairly conceptualized as an issue of spoliation, *see United States v. Greenberg*, 835 F.3d 295, 303 (2d Cir. 2016), and the constitutional duty implicated is "over and above that imposed by cases such as *Brady*," *Youngblood*, 488 U.S. at 56.

More simply, what *Youngblood* addresses is the problem that arises when evidence of unknown value is permanently lost.   In those circumstances, a new trial in which the fact finder can consider the exculpatory evidence is impossible.  *Cf. Sipe*, 388 F.3d at 492 (remanding for a new trial based on withheld evidence that violated the government's *Brady* obligation).   Further complicating the problem is "the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed."  *Trombetta*, 467 U.S. at 486.   That is why the Court in *Youngblood* included a bad faith requirement; it is a proxy from which to infer "that the evidence could form a basis for exonerating the defendant."  *See* 488 U.S. at 58.   This is in contrast to *Brady*, where that kind of inference is unnecessary since the withheld evidence is in the prosecution's possession and can be evaluated.

Appellants, on the other hand, treat *Youngblood* as an alternative avenue to reach a *Brady* violation when a defendant is unable to show that the evidence in question is material and exculpatory.   They cite *United State v. Moore*, 452 F.3d 383 (5th Cir. 2006) (per curiam), where the Fifth Circuit said "impermissibly withheld evidence must be either (1) material and exculpatory or (2) only potentially useful, in combination with a showing of bad faith on the part of the government."   *Id.* at 388.   At issue in *Moore*, though, was the destruction of tape recordings, which fits the *Youngblood* framework.   *See id.*   Appellants do not otherwise explain how *Youngblood* is applicable to testimonial evidence where the evidentiary value of the testimony is known and the witnesses are under the government's control.   The Court therefore declines to consider the issue further.

## F.

Appellants' final argument concerns the outrageous government conduct doctrine. Appellants assert that the steps taken by the government in these cases, viewed as a whole, are so outrageous that due process prohibits the government from prosecuting them.   Appellants' Br. at 37–39.   Those steps include separating Appellants from their children, refusing to provide information as to the children's well-being or whereabouts, prosecuting Appellants for improper entry instead of allowing them to proceed with their asylum claims, and attempting to bypass resolution of Appellants' then-pending motion to dismiss by filing a trial motion.   *Id.*

The outrageous government conduct doctrine is rooted in *United States v. Russell*, 411 U.S. 423 (1973) and *Hampton v. United States*, 425 U.S. 484 (1976).   The defendant in *Russell* argued that his right to due process would be violated if the government was allowed to prosecute him for manufacturing methamphetamine when government agents had supplied him with some of the ingredients he needed.   411 U.S. at 425–28.   The Court disagreed but suggested that "we may

some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."   411 U.S. at 431–32.   Later, in *Hampton*, the Court clarified that "[t]he limitations of the Due Process Clause of the Fifth Amendment come into play only when the government activity in question violates some protected right of the Defendant." 425 U.S. at 490.

Since *Russell* and *Hampton*, the Third Circuit is the only court of appeals to rely on the outrageous government conduct doctrine in reversing a conviction.   *See United States v. Twigg*, 588 F.2d 373, 381 (3d Cir. 1978).   Be that as it may, the Fifth Circuit has expounded on its application; the doctrine applies when the government's conduct violates due process principles related to fundamental fairness.   *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995). "Such a violation will only be found in the rarest circumstances."   *Id.*   The doctrine is inapplicable when "the defendant is an active, willing participant in the criminal conduct that leads to his arrest."   *United States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir. 1997); *see United States v. Posada Carriles*, 541 F.3d 344, 361 (5th Cir. 2008).   Rather, to successfully assert an outrageous conduct defense, "the defendant must show government overinvolvement combined with a passive role by the defendant."   *Asibor*, 109 F.3d at 1039.   For example, the Fifth Circuit refused to apply the doctrine where the defendant ordered chemicals from a government-operated front to manufacture cocaine; attempted to cancel his order by telephone because he realized he did not have the requisite know-how to manufacture cocaine; but was persuaded by a government agent who answered the phone to instead buy chemicals for the manufacture of PCP after the agent explained that making PCP would be like "baking a cake."   *United States v. Tobias*, 662 F.2d 381, 383–88 (5th Cir. Unit B 1981).   More recently, another panel hinted that the doctrine might apply

33

when the government suborns perjury.   *See United States v. Mauskar*, 557 F.3d 219, 232 (5th Cir. 2009).

Based on the above principles, the Magistrate Court did not err in refusing to apply the outrageous government conduct doctrine under these circumstances.   The doctrine overwhelmingly turns on the extent to which the government itself had a hand in the activity leading to a criminal defendant's arrest and prosecution.   When the Third Circuit reversed the convictions in *Twigg* for manufacturing a controlled substance, it was because the government had essentially conceived of and managed the entire operation.   *See* 588 F.2d 375–76.   The defendants "ran errands for groceries or coffee" or were otherwise not involved in the manufacturing.   *Id.* at 376.   Here, by comparison, the conduct that led to Appellants' arrests was their crossing of the border into the United States at an undesignated place.   There can be little doubt that Appellants were willing participants in that activity, and they do not argue that the government was in any way involved.   *See Asibor*, 109 F.3d at 1039.   Accordingly, "[t]here is no basis for a finding of outrageous conduct here."   *Posada Carriles*, 541 F.3d at 361 (refusing to apply the outrageous government conduct doctrine where the defendant willingly participated in the activity underlying his prosecution).   Appellants' argument fails.

## V.

For the reasons set forth above, Appellants' convictions are affirmed.   The Magistrate Court did not err in denying Appellants' various motions or in entering their criminal judgments and convictions.   Further, the government did not violate Appellants' constitutional rights on any ground raised in this appeal.   It bears repeating that, in affirming Appellants' convictions, the Court does not pass judgment on the manner in which the government elected to administer and oversee the handling of these migrants and their immigration cases.   That issue is not before the

34

Court in this criminal case.   The Court has no legal basis to consider arguments that challenge anything other than the legality of Appellants' convictions for illegally entering the country at a location other than a port of entry.

SIGNED this 10th day of June, 2018.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE